FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

04 SEP 24  PM 2:50

CLERK-ALBUQUERQUE

ROSA L. ESSARY,

      Plaintiff,

vs.                                                            CIV No. 03-0961 MV/ACT

FEDERAL EXPRESS CORPORATION,

      Defendant.

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment ["Motion"] overlooks crucial evidence which establish material facts to support Plaintiff Rosa L. Essary's ["Essary"] claims. Defendant Federal Express Corporation ["Defendant" or "FedEx"] omits a crucial fact: Defendant's own Human Resources Department reversed the first of the three "warning letters" that formed the basis of Essary's termination, on the grounds that Essary was treated differently than other managers, all of whom were male. Nor does Defendant mention that the Human Resources Department also recommended that Essary's Managing Director receive a "documented counseling" because of the defective warning letter Essary received. That evidence alone shows that Essary's claims are valid, and not subject to summary judgment. Other evidence confirms it: Other male managers were not disciplined in the same fashion for similar or worse conduct for which Essary was ultimately terminated.

Therefore, contrary to Defendant's arguments, first, Essary meets each of the four requirements to establish a *prima facie* case of discrimination, including that she was treated



differently than her male peers, and replaced by a male when she was terminated.  Second, Defendant material evidence supports Essary's claim of show that retaliation.  Finally, facts exist which show that the evidence upon which Defendant relies for its adverse employment actions against Essary is pretext.

Defendant's Motion for Summary Judgment should be denied.

## I. INTRODUCTION

Rosa Essary was employed with FedEx for approximately sixteen years.  She had a long record of praised performance and accomplishment.  After filing an internal EEO complaint, alleging disparate treatment compared to the male station managers, the documented counselings and disciplinary actions increased dramatically.  Within a few months, Defendant ended her career, just a few short years away from retirement.  The reasons Defendant gives for her termination are pretextual, with both substantive and procedural irregularities that give rise to an inference of discrimination and retaliation.  Both FedEx's internal EEO investigation and the EEOC's investigation concluded that Essary had been subjected to disparate treatment compared to the other (male) station managers.  The EEOC went on to find probable cause in Essary's favor for gender discrimination as well as retaliation.[1]

## II. PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.      Undisputed.

2.      Undisputed.

---

[1]

The EEOC did not make a determination on the age discrimination claim. Testimony and documentary evidence supports the allegations of gender discrimination and retaliation, as such Plaintiff will withdraw allegations of age discrimination.

3.  Undisputed. It is noteworthy that Vice-President Psarianos recalled Managing Director
    Wendell Beckles referring to Essary as "extraordinary, one of the better CSAs [Customer
    Service Agents] he had ever seen." (Deposition of Psarianos, attached as Exhibit 1, 37:16-
    21.)

4.  Undisputed.

5.  Undisputed.

6.  Undisputed.

7.  Undisputed, but incomplete. The CSA group to which Essary was assigned was a difficult
    group, as Wendell Beckles had known. (Essary Dep., Deft's Exh. A, 46:13-25)

8.  Undisputed, but immaterial. The July 8, 1999 Written Counseling—two years old at the
    time of Essary's termination—was not and could not have been used as grounds for
    Essary's termination. FedEx has a progressive discipline policy. (Deposition of Deborah
    Reed-Garcia, attached as Exhibit 2, 17:15-17). Although no policy dictates the time that a
    Written Counseling (also called "Documented Counseling") remains in an employee's file, the
    more serious disciplinary tools of a Performance Reminder and a Warning Letter stay in an
    employee's file for only six months and one year, respectively. (Deposition of Melinda Baca,
    attached as Exhibit 3, 61:21-62:2; Deft's Exh. Z (listing three Warning Letters received
    within a 12-month period as grounds for Essary's termination); *see also,* Warning Letters
    (Deft's Exhs. K., M., and Y); Defendant's Statement of Undisputed Material Fact No. 52[2]

---

[2] Hereinafter, Defendant's "Statement of Undisputed Material Facts" will be referred to
    as "Deft's MFN"; Plaintiff's Response to those facts, and Plaintiff's own "Statement of
    Material Facts" will be referred to as "Pltf's MFN."

(under FedEx policy, termination based on three Warning Letters requires the Letters to have been issued within the preceding 12-month period).)

9.     Undisputed, but immaterial. *See* Pltf's MFN 8, above.

10.     Undisputed, but immaterial. *See* Pltf's MFN 8, above.

11.     Undisputed that Essary received a "critically low" SFA score of 3.1, one-tenth of a point lower than the cut-off level of 3.2, but immaterial and misleading because:

     a.     Essary's SFA score was not grounds for Essary's termination, nor for any disciplinary action. (*See* Deft's Exh. Z.)

     b.     Essary's most recent SFA score prior to her termination was 3.6. (Deft's Response to Request for Production No. 17, attached as Exhibit 4.)

     c.     "Critical" SFA scores are not unusual for managers. (Deposition of Floyd Jordon, attached as Exhibit 5, 10:4-9.) For example, Melinda Baca received a critical SFA of 2.6 in April 2001. (Deft's Response to Request for Production No. 17, Exh 5).

     d.     Essary's low SFA score was a result of being assigned to a difficult CSA group which had not been held accountable by prior supervisors. (*See* No. 7, above; *see also* Deposition of Wendell Beckles, attached as Exhibit 6, 16:4-13 (testifying that "trying to move [challenging] places forward and trying to implement change. . . [can affect] the survey for a period of time."); Exhibit 5, Jordon Dep., 54:25-56:20 (testifying that CSA's "are a very tough group" and that drops in managers' SFA scores are not unusual.)

12.     Undisputed.

13.     Undisputed, but immaterial. (*See* Pltf's MFN 11)

4

14.     Disputed, immaterial, and objected to as hearsay. (Essary Dep., Deft's Exh. A, 103:12-18.)
        Patricia Koppy's hearsay affidavit is the first time that the allegation of a "scheduling
        problem" has surfaced.[3] Second, Koppy was herself responsible for assisting in proposing
        schedules, and any scheduling problem was the result of a shortage of customer service
        agents over which Essary had no control. (Deposition of Patricia Koppy, attached as
        Exhibit 7, 19:10-24:13.)

15.     Disputed, and objected to as hearsay. (Affidavit of Rosa Essary, attached as Exhibit 8, ¶
        3.) Besides, Essary's management style had "a lot of good things," including that she was
        sensitive and accommodating to employees needs, caring, compassionate, and receptive
        to employees' views. (Koppy Dep., 30:22-34:22; *see also,* Jordan Dep., 53:13-20, 54:14-
        24). Moreover, other managers occasionally exhibited disrespect toward their employees.
        (Essary Dep., Deft's Exh. A, 104:15-105:25.) In fact, Wendell Beckles had engaged in
        disrespectful and inappropriate conduct towards other managers. Exhibit 2 (Reed-Garcia
        Dep., 64:4-9)

16.     Disputed, immaterial, and objected to as hearsay. Exhibit 8 (Essary Aff. ¶ 4). Defendant
        has never before raised this allegation, and it was not part of any disciplinary action against
        Essary. Essary strenuously denies that she ever made any such statement. The inference
        of bigotry is improper.

---

[3] Koppy was deposed on August 27, 2004, after she signed her affidavit on July 28, 2004.
(Deft's Exh. G.) Paragraphs 4, 5, and 6 of the affidavit are hearsay, *see* Exh. Deft's G, ¶¶ 4, and
should not be considered.

17.   Incomplete and immaterial. Employees also said positive things to Beckles about Essary. Exhibit 6 (Beckles Dep., 58:25-59:4; 47:21-48:25). Moreover, it is not uncommon for employees to complain about any manager. Exhibit 3 (Baca Dep., 18:19-23).

18.   Undisputed.

19.   Undisputed.

20.   Undisputed.

21.   Undisputed.

22.   Undisputed.

23.   Undisputed.

24.   Undisputed. However, considered more thoroughly, the serious conflict of interest situation for which Harris was disciplined only supports Essary's disparate treatment claim. *See* Pltf's MFN 71, below.

25.   Undisputed, but incomplete. Harris received a second Warning Letter on November 27, 2000. *See* Pltf's MFN 71(b). On April 5, 2001, he received a mere Documented Counseling for an incident that was more serious that any of the three incidents for which Essary received Warning Letters. (*See id.*)

26.   Incomplete and immaterial. *See* Pltf's MFN 17.

27.   Disputed. Defendant fails to mention that the Warning Letter was supposed to have been reduced to a Documented Counseling. *See,* Exhibit 14; (Pltf's MFN 55, 56.) Nor does Defendant mention that Essary did not receive a Documented Counseling prior to being issued the Warning Letter, as is normally done pursuant to FedEx's progressive

disciplinary policy. (*See* Exhibit 3, Baca Dep., 26:18-25; Exhibit 6, Beckles Dep., 8:1-25; Exhibit 5, Jordan Dep., 49:6-16; Exhibit 2, Reed-Garcia Dep., 17:6-24: Defendant's Fact No. 40 (the non-punitive Documented Counseling precedes the warning letter under FedEx's progressive disciplinary policy, and several can and usually do precede a Warning Letter)).

The dispute related to the October 23, 2000 Warning Letter is critical to evaluating the merit of Defendant's justification for terminating Essary because that Warning Letter is one of the three Warning Letters FedEx used to support her termination. *See* Exhibit Z to Defendant's Motion (three warning letters, October 23, 2000, February 6, 2001 and July 16, 2001 supported termination). According to the Human Resources Manager, without the October 2000 Warning Letter, FedEx would not have had sufficient justification to termination Ms. Essary. Exhibit 2. (Reed-Garcia Dep., 105:24-106:11).

The October 23, 2000 Warning Letter was also procedurally irregular. Beckles should have issued the Warning Letter himself, but instead, had another manager do it. *Id.* Beckles should have discussed the matter with Essary prior to issuing the warning letter. *Id.* Beckles' actions were inconsistent with FedEx procedures. Exhibit 2 (Reed-Garcia Dep. 74:23-76:4.)

28. *See* Pltf's MFN 27, above. Also, other male managers received mere Documented Counselings for the same issues. (*See* Pltf's MFN 71, 72, below.); *See also,* Exhibit 14.

29. *See* Pltf's MFN 27, above.

30.     Disputed; Defendant improperly infers that Essary concedes the alleged "failures." which she does not. (*See* Essary Dep., Deft's Exh. A, 103-104.)

31.     Undisputed.

32.     Undisputed.

33.     Undisputed but incomplete. Melinda Baca was Acting Senior Manager for several months before her formal appointment in January, 2001 to Senior Manger. Exhibit 3 (Baca Dep., 14:12-21; *see also* Exhibit 2. Reed-Garcia Dep., 42:9-14 ("another senior manager was put in position who had been a peer. . ."; *see also*, Essary Aff., ¶ 5.)) Essary was the only female manager during that time. (*Id.* at 22:12-24:25.)

34.     Undisputed.

35.     Immaterial.

36.     Immaterial and incomplete: *see* Pltf's MFN 11(a)-(d) above.

37.     Undisputed that Essary received the Warning Letter, but disputed that Essary made "inappropriate comments about an employee in front of other employees." (Essary Dep. attached as Exhibit 9, 113:25-114:15.) Even so, Defendant failed to follow its progressive disciplinary policy and procedure, which is to issue at least one Documented Counseling before issuing a Warning Letter. Exhibit 6 (Beckles Dep., 8:1-25); Exhibit 2 (Reed-Garcia Dep. 16:22-17:24); Exhibit 5 (Jordan Dep., 49:6-16.) By contrast, male manager subsequently received only a Documented Counseling for the same alleged misconduct. (Pltf's MFN 74.)

38.     Immaterial.

39.  Immaterial. That Documented Counseling was not and could not have been used to support Essary's termination. *See* ¶ 8 (Warning Letter stays in an employee's file for one year, and a Performance Reminder for six months).

40.  Undisputed.

41.  Undisputed that Baca gave Essary the Documented Counseling, but incomplete; the failure to make scan compliance goals—the topic of the Documented Counselings in Defendant's Exhibits O and P—was not uncommon among managers. *See* Exhibit 5 (Jordon Dep., 18:8-19:3; 22:2-7 (discussing FedEx report that showed monthly failures to meet scan compliance goals during the 13 months from February 2000 to February 2001, and that the scores reflect on all managers, not just one)). In fact, a male manager, Robert Portillo, received five Documented Counselings from April 5, 2001 to June 29, 2001 for failure to make scan compliance goals. (Portillo's Documented Counselings of April 5, April 11, April 26, May 31, and June 29, 2001, attached as Exhibit 10).

42.  Disputed as incomplete: Essary entered the timecard because the person who was then responsible for assisting with such matters was unable to assist Essary, and in order to make sure the affected employee would get paid. (Essary Dep., Deft's Exh. A, 130:5-22).

43.  Undisputed but immaterial; the incident was not part of the decision to terminate Essary.

44.  Undisputed but immaterial; the incident was not part of the decision to terminate Essary.

45.  Undisputed but immaterial; the incident was not part of the decision to terminate Essary.

46.  Undisputed.

47.  Undisputed but immaterial.

48. Disputed that Essary received a July 21, 2001 Documented Counseling, and Defendant did not attach any such exhibit. Also disputed that Essary was responsible for the "truck accident," in which freight fell off of a FedEx truck on the freeway. In fact, in 2000, a similar incident occurred, for which the responsible employee—the truck driver—was disciplined but his male manager was not disciplined. Exhibit 5 (Jordon Dep., 49:20-50:4) Moreover, discipline of a station manager, as opposed to the ramp manager who has control over the driver, is inappropriate. (*Id.* at 50:5-53:2).

49. Undisputed but immaterial.

50. Disputed. Contrary to Defendant's statement, Essary did *not* admit that she made an "inappropriate comment" to a subordinate. (*See* Essary Dep., Deft's Exh A, 157:20-158:5; *see also*, Deft's Exh. X (Essary's writing: "I disagree with this counseling"). Moreover, the Warning Letter is hearsay.

51. Undisputed but incomplete. Essary could not find employee Dan Gomez's timecard in order to correct it, and later learned that it had been sitting on Baca's desk. (*See* July 19, 2001 statement from Essary, attached as Exhibit 11; *see also*, Deposition of Sandy Roberts attached as Exhibit 12, 22:2-24:9 (testifying about Essary searching for Gomez's timecard). Moreover, Floyd Jordon, who was a manager during the same time that Essary was, entered time cards late but was never disciplined. Exhibit 5 (Jordon Dep., 25:7-12) According to Jordon, all managers occasionally entered timecards late. (*Id.* 28:23-29:1).

52. Undisputed.

53. Disputed. *See* ¶ 27.

10

54.   Disputed as misleading and incomplete.   The Guaranteed Fair Treatment Process
["GFTP"] and the EEO Process ["EEO Process"] were and are separate procedures, with
a "huge distinction." (Deposition of Leslie Coleman, attached as Exhibit 13, 20:4-21:20.)
The GFTP allows an employee to grieve a discipline, and is finalized by executive
management.  The EEO Process, on the other hand, is handled by the Human Resources
Department ["HR"] to address an employee's EEO complaint of alleged discrimination,
and to determine "whether an individual has been treated fairly or unfairly according to
Title VII rules and regulations."  Exhibit 2 (Reed-Garcia Dep., 29:5-12); Exhibit 13
(Coleman Dep., 16:12-14, 22:5-18).

In the EEO Process, Defendant's legal department forwards a memo to the
advisor from HR Compliance who is assigned to the case—in this case, Leslie Coleman.
Exhibit 13 (Coleman Dep., 16:12-17:3, 34:21-35:3)  Where the Managing Director is
involved in the alleged discrimination—in this case, Wendell Beckles—the memo goes
to the vice president who investigates or delegates the investigation—in this case, Adam
Psarianos's designated HR manager Deborah Reed-Garcia. Exhibit 2 (Reed-Garcia Dep.,
11:7-10); Exhibit 13 (Coleman Dep., 51:17-22).

As part of a normal investigation, Reed-Garcia will "identify witnesses,
formulate questions, go specifically–almost always go specifically to the location where
the witnesses can be found, conduct the investigation process by asking questions and
follow-up questions, gather documents that are pertinent to the situation, and look at those,
and then put together a report base on the answers to the questions, the documentation and

11

so forth, and you write the investigative report and you give recommendations." Exhibit 2 (Reed-Garcia Dep., 8:10-9:10).

The matter then goes back to Human Resources for further review and to make sure the final report is complete. Then HR closes the complaint (*Id.* at 17:7-24.) The last step to the EEO Process is the "EEO Closure" document. (Reed-Garcia Dep., 10:12-18)

55. Disputed, misleading, and incomplete. Defendant improperly conflates the GFT and EEO Process to support its position that Essary did not engage in protected activity but merely complained about general unfair treatment. However, Essary's February 27, 2001 EEO Complaint regarding the October 2000 Warning Letter inherently alleged disparate treatment/discrimination. (*See* Pltf's MFN 54; Deft's Exhibit AA ("Please allow this letter to serve as written notification of my EEO Complaint.")). Additionally, Defendant's HR personnel understood that Essary's EEO complaint alleged that she was being treated differently from her male managers (*See* Pltf's MFN 57).

56. Undisputed, but incomplete. HR agreed that Essary's complaint was valid.

Leslie Coleman, as the HR Compliance advisor assigned to Essary's EEO complaint, reviewed the report of the investigation of Essary's complaint, and discussed the matter with the investigator, Deborah Reed-Garcia. Exhibit 13 (Coleman Dep., 44:10-13, 51:17-52:8). Although Reed-Garcia does not specifically recall getting approval from vice-president Psarianos prior to submitting her report to HR Compliance, her normal practice is to not send an EEO investigation report to HR Compliance without

authorization from upper management—Vice-President Adam Psarianos—and she would not have done so in this case. (Reed-Garcia Dep., 32:8-21, 54:9-22).

Coleman recommended to Reed-Garcia that the report be changed to, among other things, reduce Essary's Warning Letter to a documented Counseling, and to discipline Wendell Beckles, for in part, "inconsistent treatment of employees. . ." (June 8, 2001 e-mail from Leslie Coleman to Psarianos, attached as Exhibit 14[4]) Reed-Garcia agreed with the changes, and as part of her normal practice, Reed-Garcia would have obtained approval from upper management for the changes. Exhibit 2 (Reed-Garcia Dep., at 34:23-25, 35:1-6).

Finally, the "EEO Closure" document that was issued as a result of this process directed, *inter alia*, that the October 23, 2000 Warning Letter be reduced to a Documented Counseling, and that Beckles receive a Documented Counseling for "inconsistent treatment" of Essary relative to other employees. *See* Exhibit 14, Exhibit 25. Reed-Garcia recalls "aberrations in the discipline that was issued to people in similar situations." Exhibit 2 (Reed-Garcia Dep., 62:8-12).

Psarianos does not remember anything about the directive that Essary's Warning Letter be reduced to a Documented Counseling, or his involvement in the matter, or why the Warning Letter was not actually reduced. He has no specific recollection of

---

[4] Plaintiff used the EEO Closure document—the June 8, 2001 e-mail—in most of the depositions, and labeled it as Exhibit 24 for the deposition Exhibit notebook. Essary did not know of the EEO Closure or that her Warning Letter was supposed to have been reduced until the EEO Closure surfaced in discovery. However, the EEOC specifically found "Charging Party's complaint was resolved and the written warnings were removed." Pltf's MFN 78, Exhibit A to Plaintiff's Complaint.

either upholding the warning letter or reducing it to a documented counseling. Exhibit 1
(Psarianos Dep., 65:16-67:15; 70:4-71:23).

57.     Disputed.   Leslie Coleman, the Human Resources Advisor at the time who was
investigating Essary's EEO complaint, understood that Essary had alleged that she was
treated differently than the male managers.. (Coleman Dep., 34:21-35:3; 45:6-20).  Also,
before she filed her EEO complaint, Essary told Deborah Reed-Garcia, the Regional
Human Resources manager, that she was being treated differently and "scrutinized more"
than the other male managers.  (Reed-Garcia Dep., 42:7-22; 72:11-21).

58.     Disputed.  Baca as Acting Senior Manager was present when Santa Fe senior manager
Scott Sullivan gave Essary the October 2000 Warning Letter.  Exhibit 8 (Essary Aff., ¶ 6);
Exhibit 9 (Essary Dep., 53:22-54:17).

59.     Undisputed.

60.     Undisputed except for the use of the word "hearing"—"meeting" is more accurate—but
incomplete. Essary's EEO complaint against the October 2000 Warning Letter was closed
in June 2001, and Wendell Beckles received a Documented Counseling on June 19, 2001,
shortly before Essary was terminated, as a result of Essary's EEO complaint.  Exhibit 2
(Reed-Garcia Dep., 106:12-22). Therefore, Beckles should not have had a role in Essary's
GFTP pursuant to FedEx procedures, nor in the decision to terminate Essary.  In order to
prevent retaliation in cases where an employee has brought an EEO—as Essary had—the
employee's managers must consult with Human Resources in any additional disciplinary
issue during or soon after the EEO.  (*Id.* at 21:4-23). However, Deborah Reed-Garcia, the

manager of Human Resources at the time, was not consulted and did not know that the October 2000 Warning Letter was used as grounds for the termination. Reed-Garcia does not know whether anyone at Human Resources was consulted in the decision to terminate Essary. (*Id.* at 104:22-25; 102:22-103:14; 108:21-23).

61. Undisputed.

62. Undisputed, but immaterial as to the motive for the decision.

63. Undisputed.

64. Undisputed.

65. Undisputed that Essary did not accept the inferior positions in Santa Fe, but Essary disputes the implication that Essary only took classes, as the evidence establishes that she looked for full-time work as well as took classes. Essary continued to look for full-time work and attended classes towards a new career. (Essary Dep., Defts' Exh. A, 34:11-36:25).

### III. PLAINTIFF'S STATEMENT OF MATERIAL FACTS

66. From March 22, 1999 to May 9, 2001, Essary received 12 letters of commendation for her good work, including two from Wendell Beckles thanking her for her "outstanding job . . . Your results were the best in the District for Memorial Day," and her "outstanding leadership . . .in guiding this group of CSA's to the level of performance they have achieved in the area of CQMC. I am fully aware of the fact that you have been down CSA's, but your group excelled anyway." (Letters attached as Exhibit 15).

67.  In 1999 Vice President Psarianos was part of a corporate-wide team for reducing "send-agains (undelivered packages)." (Psarianos Dep., 32:19-33:19)  Psarianos asked for the "best" managers at the time to attend a workshop addressing that issue in Texas.  (*Id.*) Essary was selected to attend the Texas workshop. Exhibit 8 (Essary Aff, ¶ 5).

68.  According to Floyd Jordon another Station Manager, Essary "was a very diligent worker. You know, like the rest of us, you spent 12 to 16 hours a day at FedEx.  As far as her documentation of things, I thought she did a decent job.  I looked in her files, because I took over part of her work group after she left, and I didn't notice anything that was out of the ordinary.  So I thought she did a very good job, you know, as a manager as far as her work habits with FedEx." Exhibit 5 (Jordon Dep., 54:14-24).

69.  Wendell Beckles, who was Melinda Baca's boss when Essary was terminated, approved the decision to terminate Essary.  Exhibit 3 (Baca Dep., 60:21-25; 68:5-8).

70.  Besides Essary, from October 2000 until Essary's termination the other station managers were male: Robert Harris, Robert Portillo, Floyd Jordon. Exhibit 3 (Baca Dep., 22:12-25-24); *see also*, Exhibit 5 (Jordon Dep., 77:20-78:1).

71.  Robert Harris had several serious disciplinary matters, but was not terminated, as follows:

a.  On November 6, 2000, Harris received a Warning Letter over a serious conflict-of-interest issue: He owned a car wash company which was a vendor for FedEx. Vice President Adam Psarianos upheld the Warning Letter, in part because he had been warned previously by FedEx's Legal Department about the impropriety of that type of

relationship. ((Deft's Fact No. 25: Beckles Dep., 54:6-56:9; November 24, 2000 Psarianos letter attached as Exhibit 16).

b.         On November 27, 2000, Harris received a second Warning Letter for perceived employee favoritism; on December 15, 2000, Psarianos also upheld that Warning Letter. (Warning Letter and Letter from Psarianos attached as Exhibit 17)

c.         On February 19, 2001, Harris was suspended but received a mere Documented Counseling over a incident in which one of Harris's employees did not receive the pay due her, and Harris suggested time-card falsification to the employee to remedy the matter or that he would buy lunches for the employee (February 19, 2001 Letter of Suspension, and April 5, 2001 Documented Counseling, attached as Exhibit 18).

d.         On May 17, 2001, Harris voluntarily resigned, and executed a severance agreement sometime before September 7, 2001. (PRISM Authorization Forms, attached as Exhibit 19).

72.    From October 16, 2000 to June 29, 2001, Portillo received thirteen Documented Counselings. (Portillo Documented Counselings, attached as Exhibit 20; *see also,* Pltf's MFN 41, above, and Exhibit 10).

73.    Floyd Jordon entered time cards late but was never disciplined. Exhibit 5 (Jordon Dep., 25:7-12) According to Jordon, all managers occasionally entered timecards late. (*Id.* at 28:23-29:1) For example, Melinda Baca has done so at least twice. (*See id.* at 30:9-31:13 (discussing timecards attached as Exhibit 21). Because managers had so many employees assigned to them, and due to the shortage of managers "time cards took a low priority." (*Id.*

17

at 23:14-25.) At times, there are "extenuating circumstances that managers just can't control." (*Id.* at 24:18-25:3.)

74.    Floyd Jordon received a Documented Counseling for "an inappropriate conversation" on May 31, 2002 between him and one of his employees and in front of another employee. (June 10, 2002 Documented Counseling from Melinda Baca attached as Exhibit 22). By contrast, Essary received the much more serious Warning Letter for the same conduct, and that Warning Letter was used to support her termination. (Deft's Fact No. 37).

75.    Floyd Jordon overlooked entire truckload of freight and was not given either a documented counseling or a Warning Letter, but merely a letter.. Exhibit 5 (Jordon Dep., 42-43). Exhibit 28.

76.    Since Essary was terminated, four males were placed into management positions, including Essary's former position. (Deft's Responses to Interrogatory No. 5 and Supplemental Response to Interrogatory No. 4, attached as Exhibit 23; Baca Dep., 10:10-16).

77.    The practice at FedEx in the decision of whether to terminate an employee is to consider the employee's work history. However, Baca looked no further than Essary's prior year. Exhibit 3 (Baca Dep., 61:21-62:7).

78.    Deborah Reed-Garcia, the Regional Human Resources manager who investigated Essary's internal EEO complaint regarding the October 2000 Warning Letter, believed that Essary should not have received the Warning Letter, but only a Documented Counseling. She recommended that Beckles receive a Warning Letter; however, upper

management—Psarianos—disagreed and issued only a Documented Counseling to

Beckles. Exhibit 2 (Reed-Garcia Dep., 63:11-15, 64:18-20); Exhibit 25.

79.     The EEOC investigated Essary's allegations and concluded:

> The evidence shows that Charging Party was treated differently that male coworkers when she was disciplined and issued three written warning letters for poor performance. Evidence shows that Charging Party was terminated on July 16, 2001 as a result of having three different warnings with a year. Evidence shows that Charging Party had filed an internal EEO complaint on or about February 27, 2001, on the basis of sex for being disciplined while males holding the same position as she were not. The evidence shows that Charging Party filed an internal sex complaint on or about February 27, 2001, because she had been disciplined and males were not. Charging Party's complaint was resolved and the written warnings were removed. Respondent reinstated Charging Party to a non-management position effective October 10, 2001 with less pay and at a different location outside the Albuquerque area. The evidence shows the Charging Party notified the Respondent within 72 hours she was not accepting the job because it was not full relief of her internal complaint. The record shows Charging Party filed another complaint with the Commission on September 27, 2001. The record further shows that Respondent terminated Charging Party again on October 10, 2001, for not showing up for work.

> Based on this analysis, I have determined that more likely than not the Respondent violated the Civil Rights Act of 1964, as amended in that Charging Party was disciplined and terminated on July 16, 2001, because of her sex (female); and/or in retaliation for filing her internal complaint of discrimination; Charging Party was retaliated against in the terms and conditions, and privileges of employment and wages when she was demoted in title, pay and location of work on July 16, 2001; and Charging Party was again retaliated against when Respondent terminated her employment on October 10, 2001.

> Exhibit A to Plaintiff's Complaint.

## IV. STANDARD OF REVIEW

A motion for summary judgment should be denied unless the moving party shows that

there is no genuine issue as to any material fact and that such party is entitled to judgment as a

matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986); *Celotex

Corp. v. Catrett*, 477 U.S. 317 (1986); *Thrasher v. B & B Chem. Co. Inc.*, 2 F.3d 995 (10th Cir.

1993). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

"If a plaintiff succeeds in raising a genuine issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed." *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995), citing *Washington v. Garrett*, 10 F.3d 1421,1433 (9th Cir. 1993). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 150 120 S.Ct. 2097, 2110 (2000), citing *Liberty Lobby, Inc.* at 255.   Employment discrimination cases are particularly ill suited for summary judgment because they involve questions of motive and intent. *See, Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir.)(questions of motive and intent are "particularly inappropriate for summary judgment disposition").

## V. ARGUMENT

### A. Gender Discrimination

Discrimination on the basis of gender is unlawful under Title VII of the Civil Rights Act of 1964, and the New Mexico Human Rights Act. Plaintiff may use either direct or circumstantial evidence to demonstrate discrimination.

### 1. Plaintiff Has Direct Evidence of Discrimination

Essary has probative direct evidence that FedEx discriminated against Essary on the basis of her gender. As a result of Essary's EEO complaint alleging disparate treatment, Defendant's own HR Compliance Office concluded that the "warning letter issued to Rosa addressed common mistakes performed by other manager(s) that received lesser discipline: Robert Portillo and David Harris." "Other managers stated they were never held accountable for the things Rosa was disciplined for prior to Michelle Baca (then why was Rosa given a warning letter and not a documented counseling initially)." Exhibit 14, p. 2. Rosa was subjected to "inconsistent treatment." *Id.* Witness testimony confirms the conclusions referenced above. *See* Pretext Argument below. Evidence that an employee outside of the protected group was treated more leniently is "sufficient evidence of similarity. . . to at least raise a factual question whether disparate treatment may have occurred." *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407,1412-1413(10th Cir. 1984). This type of direct evidence is adequate "to create a genuine issue of dispute regarding pretext." *Kendrick v. Penske Transportation Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000).

### 2. McDonnell Douglas Framework

Employment discrimination cases relying on indirect evidence are analyzed using the familiar McDonnell Douglas burden-shifting framework. *McDonnell Douglas v. Green,* 411 U.S. 792 (1973). *Kendrick,* 220 F.3d at 1226. This framework requires the plaintiff to first establish her prima facie case, which can be done by proving that: (1) she is a member of a protected class; (2) she was otherwise qualified for the position; (3) she was discharged by the defendant; and (4)

she was replaced by someone not in her protected class. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981); *McCowan v. All Star Maintenance*, 273 F.3d 917 (10th Cir. 2001). This is recognized as being a stricter test, but one that Essary case can meet. *See Brown*, 746 F.2d at 1410.[5] The plaintiff's burden of establishing a prima facie case of disparate treatment is "not onerous." *Texas Dept. of Community Affairs*, 450 U.S. at 253; *Pitre v. Western Electric Company, Inc.*, 843 F.2d 1262, 1265 (10th Cir. 1988). "The prima facie case is a flexible standard that may be modified to relate to different factual situations." *Randle*, 69 F. 3d at 451.

Essary has a prima facie case. First, as a woman, Essary is within a protected class. Second, Essary was qualified for the position of Station Manager. She was asked to apply for the management position because she was an "outstanding" customer service agent. (Deft's MFN 3). She was described as "extraordinary." Exhibit 1 (37:16-21). She applied for and was hired as a station manager in 1998. (Deft's MFN 5, 6). Defendant has never explicitly asserted that she was not qualified as a station manager, but rather alleges that Essary's performance was sub-par.[6] Even if Defendant's argument is interpreted to be related to her qualifications as a manager, Defendant cannot defeat Essary's prima facie case on the basis of lack of qualification using the proffered reason for her discharge. *EEOC v. Horizon/CMS Healthcare*, 220 F.3d 1184, 1192-1193. Finally,

---

[5] The easier test has a different fourth element, and requires only that the job was not eliminated after her discharge. *Kendrick*, 220 F.3d at 1231.

[6] While Defendant asserts Essary's performance was inadequate, she was never issued a performance reminder, which under FedEx policy is the disciplinary tool used to addressed inadequate performance. *See*, Exhibit 5, 73: 8-12.

Essary was terminated from her job.[7]   (Deft's MFN 53.)   Essary was replaced by a man.   (Pltf's

MFN 76.)   Essary has established a prima facie case of discrimination based on gender.[8]

Defendant has asserted that Essary was terminated for receiving three warning letters in

a 12-month period.   (Deft's MFN 52, 53).   While Essary disputes the underlying validity of the

warning letters, she does not dispute that Defendant's explanation satisfies the second-stage

burden under McDonnell Douglas.   However, Essary has sufficient evidence to establish that the

reason proffered is suspect and pretextual.

### 3. Pretext

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to

articulate some legitimate, nondiscriminatory reason for its employment action.  If the employer

makes this showing, the plaintiff must then show that the justification for the adverse action is

pretextual.  If Plaintiff presents evidence that the defendant's proffered reason for the employment

decision was pretextual– i.e. unworthy of belief, the plaintiff can withstand a summary judgment

motion and is entitled to go to trial.  *EEOC v. Horizon Healthcare*, 220 F.3d 1184 (10th Cir. 2000);

*Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995); *see also Reeves v. Sanderson*

*Plumbing Prods.*, 120 S.Ct 2097, 2109 (2000)(holding that "a prima facie case and sufficient

evidence to reject the employer's explanation may permit a finding of liability").   A showing of

pretext, in itself, is all that is required to raise the inference of discriminatory intent, and no

---

[7] Defendant uses a disparate discipline analysis despite the fact that Essary was
terminated from her employment and notably replaced by a man.

[8] Defendant appears to divert from the fact that she was terminated—an adverse
employment action—with the irrelevant argument that her "several counselings" were not
"adverse employment actions.  Motion at 16.

additional showing of actual discriminatory animus is necessary. *Id.* To require more would be an endorsement of the impermissible pretext-plus test rejected in *Reeves.*

A plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could reasonably find them unworthy of credence." *EEOC,* 220 F.3d at 1198; *Morgan v. Hilti, Inc.* 108 F.3d 1319, 1323 (10th Cir. 1997). A variety of forms can be used to establish that the stated reasons for the adverse action are pretextual, typically a showing of pretext can be shown in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick,* 220 F.3d at 1230. Essary has evidence that falls into all three categories.

### a. Defendant's Proffered Reason for Termination Is Pretext

Defendant's proffered reason for terminating Essary is suspect. In a letter dated July 16, 2001, Essary was informed that she was being terminated "for receipt of three warning letters within a twelve-month period." (Def't's MFN 53, and Termination Letter attached thereto as Exhibit Z; *see also,* Pltf's MFN 53). Defendant asserts that the warning letters were nondiscriminatory and that Essary cannot show that she was treated less favorably than peers not in her protected class. *See* Motion at 16. However, the evidence shows that Essary was treated less favorably than the male managers. Indeed, Defendant's own HR Compliance Office found that Essary received "inconsistent treatment." (Pltf's MFN 56).

### b. Plaintiff's First Warning Letter/October 23, 2000

Essary received her first warning letter in 15 years of service on October 23, 2000 regarding six alleged problem areas.   Although Defendant has a progressive discipline policy (Pltf's MFN 8, 27). Essary received no indication of inadequacies in any of the referenced areas. FedEx policy is that employees be given documented counselings to inform them of the area of concern prior to the warning letter. (Pltf's MFN 27). Floyd Jordon, a 12-year FedEx employee, who was a manager during the time that Essary worked at the Albuquerque Station, testified that warning letters were reversed if not preceded by documented counselings.  Exhibit 5 (Jordon depo., 72:20-25-73:1-8). An employee can receive several documented counselings per year prior to receiving a warning letter and that is typically the case. (Pltf's MFN 27).

Essary filed an internal EEO complaint alleging disparate treatment compared to other stations managers, all of whom were male.  The formal EEO Complaint was filed on February 27. 2001, but Essary had informally addressed her concerns regarding discriminatory treatment earlier with Human Resources. (Pltf's MFN 57); Exhibit 24.  An EEO investigation is utilized when an employee alleges discrimination, and is handled by the Human Resources Department.  (Pltf's MFN 54). Essary's EEO complaint was handled by HR Compliance advisor Leslie Coleman, and because the EEO complaint was against Managing Director Wendell Beckles, HR Manager Reed-Garcia.  (*Id.*)  Reed-Garcia's investigation is thorough.  (*Id.*)

The first Warning Letter was full of procedural and substantive irregularities.  First, pursuant to Defendant's progressive disciplinary policy, Essary should have received a Documented Counseling before receiving a Warning Letter. (Pltf's MFN 27). Additionally, by

FedEx policy, Beckles should himself have issued and explained the Letter to Essary, but he did not. (*Id.*)

Moreover, Beckles should never have been involved in Essary's appeal of her termination through FedEx's Guaranteed Fair Treatment Process because of the possibility of retaliation arising from Essary's earlier EEO complaint. (Pltf's MFN 60). Yet, Beckles was the person who upheld Essary's termination. (*Id.*)

Substantively, Reed Garcia recalled "that there were aberrations in the discipline that was issued to people in similar situations." (Pltf's MFN 56.) As a result of the irregularities and inconsistencies, Managing Director Wendell Beckles was issued a documented counseling for inconsistent treatment of employees as a result of the warning letter issued to Essary. (Pltf's MFN 56, 60, 78). Reed Garcia believed that Beckles should receive a Warning Letter. (Pltf's MFN 78). But the Regional Vice-President did not agree, and issued only a documented counseling on June 19, 2001. (*See*, Exhibit 25). The counseling was issued specifically "for not discussing with Rosa Essary your issuance of a Warning Letter to her, and the fact that it was delivered by another manager," and "or the letter addressing common mistakes performed by other managers who did not receive discipline for the same mistakes." Personnel Representative, Curt Johnson, was disciplined as well as Karen Trautman for "inappropriate behavior towards a member of management." Exhibit 14, p.2. The disciplinary action against Ms. Trautman was related to her retention of Essary's timecards. Trautman monitored Essary's timecards and complained to the senior manager about her timecards." Exhibit 2 (Reed-Garcia 67:3-13). Trautman did not do that

26

to other managers. *Id.* Reed Garcia recommended a more serious disciplinary action against Trautman, but Wendell Beckles opposed it and only a documented counseling was issued.

The only directive in the EEO Closure document not followed through with was the reduction of Essary's warning letter to a documented counseling. The EEO Closure document requires that the directives be completed within ten days from the issuance of the document. Exhibit 14. Despite being informed by Human Resources of the fact that Essary was not being treated consistently with the other managers [male], and the existence of numerous irregularities with the issuance of the October 23, 2000 warning letter, Essary's warning letter was not changed to a documented counseling as directed by HR Compliance. This type of evidence has been found to be "very strong evidence of intentional discrimination and very strong evidence that the Defendant's proffered reasons are nothing but pretext". *Haas v. State of New Mexico,* No. CIV 97-1358 MV/DJS Memorandum Opinion and Order (D.N.M. October 30, 1998) (disparity that had a correlation to gender was brought to attention of the Personnel Office and Defendants intentionally chose not to remedy the problem).

<u>Plaintiff's Second Warning Letter</u>

Essary's second Warning Letter, issued February 6, 2001, accused her of making unspecified "inappropriate comments about an employee in front of other employees." (Deft's MFN 37). That Warning Letter is also suspect. As with her first Warning Letter, Essary did not first receive a Documented Counseling. (Pltf's MFN 37). Yet a male manager, Floyd Jordon, subsequently did receive only a Documented Counseling for the same conduct. (Pltf's MFN 64).

Therefore, Essary was treated less favorably than a male peer. *See,* Argument related to Retaliation, p. 30-32.

Plaintiff's Third Warning Letter

Essary was issued her third warning letter on July 16, 2001 alleging time card violations. Specifically she was accused of neglecting to enter or correct the timecards for an employee in her workgroup. (Deft's MFN 51). While Essary had received documented counselings previously related to the timecard issue, the circumstances of this warning letter and the timecard violations of other managers demonstrate that she was treated less favorably then her male colleagues. Essary can demonstrate less favorable treatment by comparing herself to a single member of non-protected class. *EEOC,* 220 F.3d at 1197.

Witness testimony and documentary evidence confirm that timecards were entered late by other managers who were not disciplined. Floyd Jordon, a peer manager during the period of time that Essary was a manager, occasionally entered timecards late, but was never disciplined for doing so. (Jordon Dep., MFN 51, 73.) It was common knowledge that every now and then all managers enter an employee's timecard late. Exhibit 5 (Jordon 28:23-25-29:1). Yet no manager has ever received a warning letter for entering an employee's timecard late in his entire career with FedEx. Exhibit 5, 33:9-15. According to Jordon, technically if an employee continues to have timecard problems and is given documented counselings previously a warning letter may be deserved, but since it is common knowledge that all managers every now and then have late timecard entries, it would have to be pretty compelling and extraordinary facts to justify a warning letter. *Id.* at 34.

28

Floyd Jordan reviewed five FedEx electronic timecards from the Albuquerque station. Exhibits 21(a)-(d). He identified the date in the upper corner as the date the employee worked. The date in the lower corner is the date the information was entered or corrected. He identified three of the time cards that were entered by the Senior Manager Melinda Baca. Exhibit 21(a)(b) and (c); Exhibit 5 (Jordan 29:4-25-30:1-7). Jordan testified that Exhibit 21(b) was probably entered late because it reflects a day off, where the employee would have been paid four hours. Exhibit 5 (Jordan 30:13-25-31:1). He went on to testify that "this was probably missed by the manager and entered late." *Id.* The day was September 3 [2001], "but the time card did not get entered until the 18th." Exhibit 21(b); Exhibit 5 (Jordan 66:11-18). "Now this one did not get entered." *Id.* The employee was paid late. Exhibit 5 at 67.

Exhibit 21(c) was entered or corrected nine days after the workday in the upper left. Exhibit 5 (Jordon 31:7-13). Melinda Baca entered the card for the employee. *Id.* Exhibit 21(d) had been entered by Richard Moreno and that was entered or updated eight days after the workday. Jordon testified that timecards should be corrected by the next day. Exhibit 5 (Jordon 32:10-19). When asked about the circumstances under which timecards should be corrected late, Jordon stated that "[a] timecard should not be corrected that late." *Id.* Whether it is entered late or corrected late, the number of days between the day worked and the day entered or corrected on the exhibits referenced illustrated that the manager was dilatory and the timecards were not processed correctly. Exhibit 5 (Jordon 32:20-25-33:1-8 [delay reflected irregularity in timecard process]).

Also noteworthy about Exhibit 21(a)-(c) is that the Senior Manager  Melinda Baca had entered the cards.  Jordon testified that the employee referenced in Exhibit 11 was not Baca's

direct subordinate. Exhibit 5, (Jordon 29:19-25-30:1-2). The Senior entered the card for the station manager. Essary had requested assistance from her supervisor Melinda Baca with the timecard because she was away from the station for days doing what is referred to as "checkride blitz." A "checkride blitz" is when managers ride with the couriers, "either all managers do at the same time, . . . or one manager does each and every one of the employees that they've been assigned to, one after the other after the other." Exhibit 2 (Reed Garcia 89:25-90:6). They are very demanding because the manager is out of the station virtually the entire time. *Id.* In the warning letter issued, Melinda Baca denounced Essary for having entered the card late fifteen days. Further complicating the situation was the fact that Essary could not locate the timecard in order to correct it. (Pltf's MFN 51.) The notes taken from the July 2001 GFT process (initated after Essary was terminated) clarify that for at least half of the fifteen day period, the timecard was on Baca's desk and not accessible to Essary. Exhibit 26, p. 399, 400 (week before on Baca's desk). The GFT notes received from FedEx in discovery contain a note on page 404 which questions whether Melinda Baca should have entered the timecard. Exhibit ("Exactly—Melinda should have fixed this employees t/c issue or Karen and not Rosa ?"). *Id.*

## B. Retaliation

Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act prohibit retaliation. Pursuant to Title VII, "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Essary must establish: (1) that she engaged in protected opposition to

discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *See, Kendrick,* 220 F.3d at 1234; *O'Neal v. Ferguson Construction,* 237 F.3d 1248, 1252 (10th Cir. 2001); *Pastran v. K-Mart Corp.,* 210 F.3d 1201 (10th Cir. 2000). The McDonnell Douglas framework is utilized to analyze retaliation as well as discrimination.

As addressed above, Essary filed an EEO complaint, which was accepted for processing, because of inconsistent treatment compared to other managers, all of whom were male.[9] (*See* Deft's Exhibit AA.). As of January 23, 2001, management was aware of Essary's EEO Complaint; Exhibit 24. Leslie Coleman, Defendant's HR Advisor was assigned to the Internal EEO Report. (Pltf's MFN 54-57). Coleman knew that Essary was asserting that she was being treated unfairly as a result of her gender. (Pltf's MFN 57). Coleman also understood Essary to assert that male managers were not subjected to the same standard of performance. (*Id.*) The Regional Human Resources Manager, Reed-Garcia, who was involved in Essary's EEO process, was also aware that Essary had concerns that she was being treated differently than male managers. (*Id.*)

Defendant's assertion that Essary did not engage in protected activity is without merit. The record is clear that Essary filed an EEO Complaint alleging discrimination and disparate treatment. Representatives of FedEx directly involved in the EEO process testified that they understood her claims to be gender based, including Coleman and Reed-Garcia. Exhibit 2 (Reed-Garcia 72:15-18)(Coleman 45:11-14). It is well established that EEO Complaints

---

[9]Defendant has attempted to obscure the fact that Essary was the only woman station manager beginning in the Fall of 2000, when she received her first Warning Letter. Melinda Baca was promoted to Acting Senior Manager. (Pltf's MFN 33.). When Don Firestone was removed in September 2000, Melinda Baca was appointed Acting Senior Manager. (*Id.*)

constitute protected activity. *See, Robbins v. Jefferson County Sch. Dist. R-1,* 181 F.3d 1171,

1178 (10th Cir. 1999). Even "[i]nformal complaints to superiors constitute protected activity."

*See, Pastran,* 210 F.3d at 1205 (10th Cir. 2000); *O'Neal* 237 F.3d at 1255.

On February 6, 2001, almost immediately after her direct supervisor became aware that

she had filed an EEO Complaint, Essary was disciplined harshly for "making inappropriate

comments about another employee." (Deft's MFN 37). Baca became aware of Essary's EEO

concerns as of January 23, 2001, and within two weeks Baca had issued her first Warning

Letter to Essary. *Id.* The warning letter does not even address the comment made, but Essary

was subsequently informed that the unacceptable comment was "well, we'll just bring her ass

back here." (Essary Dep., 113:24-114:16). Essary disputes that she used an expletive.

Defendant's witness, Patricia Koppy, testified that she has heard other managers curse

occasionally. (Deft's MFN 15). Other managers were not issued such harsh disciplinary

action for similar offenses. The only reference found in the personnel files of her peer

managers regarding interaction with employees was issued to Floyd Jordon, who was issued

a documented counseling. (Pltf's MFN 74).

Witnesses have testified that prior to issuing a warning letter, Documented

Counselings should be issued pursuant to FedEx policy and practice. (Pltf's MFN 37). Essary

never received a Documented Counseling for making inappropriate comments about an

employee (or a violation of the Acceptable Conduct Policy) prior to the February 6, 2001

warning letter. Exhibit 27. By contrast, Floyd Jordon received a documented counseling for

similar conduct. (Pltf's MFN 74).

32

"Close temporal proximity between the employee's complaint and the adverse action is a factor in determining whether the employer's proffered reason is a pretext for retaliation." *Pastran*, 210 F.3d at 1206; *Bullington v. United Air Lines, Inc.* 186 F.3d 1301, 1321 (10th Cir. 1999) (protected conduct closely followed by adverse action supports an inference of causal connection.). The two-week period between Baca becoming aware of Essary's EEO complaint and the February 6, 2001 warning letter, one of the three actions that Defendant used to support Essary's termination, gives rise to an inference of retaliatory animus.

The January 23, 2001 letter from Baca to Essary confirming her knowledge of Essary's EEO issues itself gives rise a causal connection with the February warning letter. Exhibit 24. The first issue addressed is Essary's EEO matter, and immediately after that she inquires about a situation that occurred on December 5, 2000, which is the conversation that with the employee giving rise to the warning letter. *See,* Exhibit M to Defendant's Motion. Baca herself has tied the two issues together in the January 23, 2001 letter. Additionally, Baca informs Essary that the matter will be addressed once the EEO process is completed, but the EEO process was not completed until June 2001 with the HR Compliance Closure document. *See,* Exhibit 14. Baca issued the warning letter on February 6, 2001 months before the EEO investigation was completed. Further evidencing irregularity and giving rise to an inference that the warning letter was a pretext for retaliation is the failure to follow Defendant's progressive discipline procedures regarding counselings prior to the issuance of a warning letter. *See,* Pretext Argument.

33

Essary disciplinary/counseling record prepared by FedEx illustrates that after raising her EEO concerns in early 2001, Essary experienced a dramatic increase in the number of counselings and warning letters. Essary was issued only one documented counseling in 2000, but she received eleven in 2001. She received one warning letter in 2000 (though discredited by FedEx HR), and received two in 2001. *See,* Exhibit 27.

Also giving rise to an inference of retaliatory animus is Beckles' role in the termination process. As a result of the EEO investigation, HR concluded that disciplinary action was warranted against Beckles for "inconsistent treatment" of employees. *See,* Argument above. Plaintiff's First Warning Letter/October 23, 2000.   As a direct result of Essary's EEO Complaint, Beckles was issued a documented counseling on June 19, 2001. Mr. Beckles acknowledged receipt of the counseling on June 20, 2001. During that same time period a directive from HR Compliance required that Essary's first warning letter be reduced to a documented counseling. Exhibit 14.   Wendell Beckles would have been responsible for implementing that directive. Reed-Garcia 80: 4-6. Reed-Garcia wrote a note on the EEO closure document "Eddie, the dispute was over this date vs the date on the EEO write-up. As you can see, Leslie signed this and dated it 6/20/01. Only other dispute is Wendell didn't follow up." Exhibit 14. Beckles who was just counseled for inconsistent treatment failed to reduce Essary's first warning letter to a documented counseling. Beckles was supposed to follow the directive [to reduce the first warning letter to a documented counseling] within ten days from the June directive. Exhibit 2 (Reed-Garcia 81:23-25). Less than a month later,

Beckles was directly involved in Essary's termination. Exhibit 3 (Baca Depo. 60:21-25; 68:5-8).

"A causal connection is established where Plaintiff presents "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Garrett v. Hewlett-Packard,* 350 F.3d 1210, 1221 (10th Cir. 2002), citing *Bullington,* 683 F.3d at 1320. "The critical inquiry is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id.* Essary has demonstrated that there were irregularities and in the disciplinary action supporting Essary's termination, and that Defendant's failed to comply with its own policies, practices, and internal directives. These irregularities and the timing of subsequent disciplinary actions and Essary's termination give rise to an inference that the justification for her termination was a pretext for retaliation. Essary "need not overcome [Defendant's] proffered legitimate, nondiscrimination reasons" to withstand summary judgment. *Id.*

## VI. CONCLUSION

For the foregoing reasons and based on the authorities cited, Rosa Essary respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

PEIFER & CORNELL, LLP

*Angela B. Cornell*

Angela B. Cornell
108 Wellesley S.E.
Albuquerque, NM  87109
phone: (505)266-4335

35

facsimile: (505)266-1915

Jane Gagne
108 Wellesley S.E.
Albuquerque, NM   87109
phone: (505)265-6199

Certificate of Service

I hereby certify that a true and
correct copy of the foregoing
pleading was sent this 24th
day of September 2004 via U.S.
Mail and hand-delivery to:

Edward Efkeman
Federal Express Corporation
Legal Dept.
Third Floor, Building B
3620 Hacks Cross Road
Memphis, TN 38125

Sean Olivas
Keleher & McLeod
PO Drawer AA
Albuquerque, NM 87103

Angela B. Cornell

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN.  SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**