## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROSA L. ESSARY,

      Plaintiff,

vs.                                       Civ. No. 03-0961 MV/ACT

FEDERAL EXPRESS CORPORATION,

      Defendant.

### AMENDED MEMORANDUM OPINION AND ORDER[1]

This matter comes before the Court on Federal Express Corporation's Motion for Summary Judgment, filed July 30, 2004 **[Doc. No. 41]**. The Court, having considered the motion, briefs, relevant law, and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**.

### FACTUAL BACKGROUND

The Court will begin with a short discussion of Defendant FedEx's discipline policy and then will outline the facts underlying this lawsuit.[2] FedEx has a "Performance Improvement Policy" that encompasses progressive levels of discipline to remedy deficient performance. As is relevant to this case, FedEx's disciplinary policy calls for verbal and written counseling to identify and correct minor performance issues. These are termed "Documented Counselings" and are not

---

[1] This Amended Opinion has been issued to correct typographical errors on the following pages:  6, 8, 23, and 31.  The errors are marked with an asterisk.

[2] The following facts are either uncontroverted or, if controverted, construed in a light most favorable to Plaintiff as the non-moving party.  Immaterial facts and factual averments not properly supported by the record are omitted.

considered punitive in nature. When there is a major performance problem, the employee is issued a written "Performance Reminder" or a "Warning Letter," which are detailed disciplinary notices requiring the employee to provide a detailed corrective action plan. There are differences between a performance reminder and a warning letter. A warning letter, for example, is issued to an employee for conduct failures, such as belligerence, not following a management directive, or fighting at work. A performance reminder is issued to an employee on the basis of unacceptable performance, such as arriving late. A performance reminder or a warning letter is generally preceded by one or more documented counselings, unless the matter is serious. A performance reminder will only stay in an employee's file for six months and "if there's nothing else, it comes off and you get to go on." A warning letter stays on file for a year. According to FedEx policy, an employee can be terminated if she receives three deficiency or disciplinary notifications within a twelve-month period. FedEx allows any employee to appeal a termination, as well as a written warning, performance reminder, or written counseling.

Rosa L. Essary ("Plaintiff"), a 49 year-old Caucasian woman, began work with Federal Express Corporation ("FedEx") in 1986 as a customer service representative ("CSR") based in Oklahoma City. Wendell Beckles, Plaintiff's Managing Director, considered Plaintiff to be an outstanding employee and encouraged her to apply for an open management position in the Albuquerque station. Plaintiff applied for the position and was interviewed by Don Firestone, the Senior Manager in Albuquerque, who made the decision to hire her. In October 1998, Plaintiff began work at the Albuquerque station. There were several other operations managers at the Albuquerque station at this time: Melinda Baca, Robert Portillo, Bob Harris, Floyd Jordan, and Joel Oliver. Ms. Baca became a senior manager in 2001.

2

Plaintiff's job responsibilities included supervising a group of CSAs that had been allowed by their last manager to engage in several poor employment practices. Plaintiff took on the responsibility of holding the CSAs accountable and ensuring that any poor employment practices, such as taking long breaks and arriving late, did not continue. Plaintiff's first year as a manger in Albuquerque was difficult because she had a "tough work group." Floyd Jordan, a peer manager, also felt that the Albuquerque CSAs were a difficult group.

During her first year as a manager, Plaintiff received several letters of commendation from her supervisors. On June 8, 1999, Plaintiff received a "Bravo Zulu!" letter thanking her for her work on the DIRT 2 Education Team. Next, on June 29, 1999, Plaintiff received a "Bravo Zulu!" letter from Mr. Beckles for her "outstanding job" on holiday planning. Later, on July 23, 1999, Plaintiff received an "audit" letter from Mr. Firestone complimenting Plaintiff and her CSAs on their PM Counter and Gatekeeper Operations.

Plaintiff continued to receive positive feedback from her supervisors. On August 4, 1999, Plaintiff received a "Bravo Zulu" letter from Mr. Beckles for her "outstanding leadership" in guiding her CSAs to a high level of performance in the area of CQME. He stated: "I am fully aware of the fact that you have been down CSA's, but your group has excelled anyway." On September 1, 1999, Plaintiff received a letter from Mr. Firestone thanking her for her performance and workgroup performance in August 1999. On September 6, 2000, Plaintiff received a "Bravo Zulu" letter from Mr. Firestone thanking her for her commitment to excellence in the area of safety. On April 9, 2001, Plaintiff received a "Bravo Zulu" letter from Mr. Jordan for her high scan index scores, which were "the highest the station has been in months." Later, on April 25, 2001, Plaintiff received a "Bravo Zulu" letter from Ms. Baca congratulating her on making

productivity and cost per package goals for two months in a row.  Finally, on May 9, 2001, Plaintiff, along with Mr. Jordan and Mr. Portillo, received a commendation letter for reaching cost per package and productivity goals in April 2001.

Plaintiff also received several counselings after becoming a manager.  On July 8, 1999, after about ten months as an operations manager, Plaintiff received a written counseling from Mr. Firestone for her failure to ensure 100% compliance in Frontline and Safety for the month of June. On August 13, 1999, Plaintiff received another written counseling from Mr. Firestone for failing to meet her budget targets for the month of July.  Mr. Firestone also noted that Plaintiff was falling short on her budget goals for the month of August.  Shortly thereafter, on November 18, 1999, Mr. Firestone issued Plaintiff a Letter of Concern after he discovered that Plaintiff had knowingly signed into the FedEx computer system using another employee's number.  Mr. Firestone noted that Plaintiff did this in spite of a conversation two weeks earlier "that this was not acceptable."  Mr. Firestone further noted that he knew that Plaintiff "did not intentionally with malice" sign into the computer system, rather she was "put in a situation at the last minute."  The Letter of Concern clearly stated that "[i]f this occurs again; further disciplinary action will be administered up to and including termination."

Plaintiff's own employees also had an opportunity to provide her with feedback on her performance.  Each April, all FedEx employees are required to complete an anonymous online survey about their supervisors and the company generally.  These scores are compiled to produce a "Leadership Average" on a scale of 1 (one) to 5 (five).  Over the course of Plaintiff's time as an operations manager, she received the following Survey Feedback Action ("SFA") Leadership Averages:  April 1999: 3.5; April 2000: 3.1; December 2000: 2.8; April 2001: 2.8; and April

4

2002: 3.6.  Any score lower than 3.2 is considered "critical."[3]  Plaintiff's scores were the lowest

among her group of peer operations managers each April.[4]  Mr. Beckles admitted, however, that

there are many factors, including operational reasons, that might explain a low SFA score.  For

example, Ms. Baca's first SFA score after becoming a Senior Manager was 2.6.  Pltf. Exh. 4.

Mr. Beckles traveled to the Albuquerque station in September 2000 because he was

unhappy with the location's performance.  He had also heard specific concerns about Plaintiff

from her employees.  While at the Albuquerque station, Mr. Beckles met with between 60 and 75

percent of the station's employees.  During his visit, issues arose regarding the management team

and particularly Mr. Firestone.  With regard to Mr. Firestone, Mr. Beckles saw "a lot of

performance issues. ... I felt that there were things going on in the location that he should have

been aware of that he was not aware of.  There are things that should have been addressed and

taken care of by him as the senior manager that he failed to take care of."  Mr. Beckles

specifically noted the station's service level, the accident rates, and employee morale issues.  He

also noted that Mr. Firestone failed to deal a number of management failures, including a conflict-

of-interest problem with Mr. Harris.  Finally, Mr. Beckles heard from Plaintiff's employees about

specific problems they were having with her.  Plaintiff's employees, however, also had good

things to say about her.  Ms. Patricia Koppy, a CSA working under Plaintiff, stated that Plaintiff's

management style embodied "a lot of good things."  Specifically, Plaintiff was helpful to Ms.

---

[3] Floyd Jordan, another manager, stated that it is not unusual for managers to occasionally receive "critical SFA scores."

[4] Mr. Oliver's scores were as follows:  April 1999:  4.3; and April 2000: 4.1.  Mr. Harris' scores were as follows:  April 1999: 4.2; April 2000: 4.6; and April 2001: 3.8.  Mr. Portillo's scores were as follows:  April 1999: 4.0; April 2000: 4.3; and April 2001: 3.8.  Mr. Jordan's scores were as follows:  April 1999: 3.6; April 2000: 4.0; and April 2001: 4.0.

Koppy when she was having problems with migraine headaches.

After Mr. Beckles' investigation, Mr. Firestone was removed from his position as senior manager of the Albuquerque station.  Mr. Beckles also issued Mr. Harris a Warning Letter on November 6, 2000, stating that Mr. Harris should have notified management about his relationship with FedEx vendor DonRobb* LLC, of which he was a part owner.[5]  Mr. Beckles did not suspend Mr. Harris at the time because the conflict-of-interest issue involved "other members of management outside my organization [] [a]nd, therefore, I needed to consult with my resources, HR, legal, and so on and so forth before I could take action on it."  In contrast, he stated that the issues with Plaintiff came up even before he traveled to Albuquerque, when he "found out more details" about employees' problems with Plaintiff.  As a result, Mr. Beckles placed Plaintiff on suspension and issued her a Warning Letter.  The letter stated five areas of concern:  (1) improperly coded checksits on employee timecards; (2) failure to follow policy and procedure concerning internal promotions; (3) improper scheduling practices; (4) lack of training for specific duties/responsibilities; (5) inadequate work group meetings; and (6) demonstrating a lack of respect when dealing with employees.

After Mr. Firestone's departure, Mr. Beckles needed to appoint a new Senior Manager at the Albuquerque station.  Initially, Mr. Beckles appointed Ms. Baca to be the acting Senior Manager.  She later assumed that role permanently.  Upon appointing Ms. Baca to the position of Senior Manager, he told her to try to improve the station's overall performance from what it had been under Mr. Firestone.  This included "holding the operations managers more accountable than

---

[5] Mr. Harris appealed his warning letter, but it was upheld by Mr. Psarianos on November 24, 2000.

6

they were under Mr. Firestone for issues such as scanning, service, and productivity."

On February 6, 2001, Ms. Baca issued Plaintiff a Warning Letter for "making inappropriate comments about another employee" in front of others.  Later, on March 13, 2001, Ms. Baca wrote a memo to Plaintiff regarding Plaintiff's failure to complete certain computer entries in a timely manner.  On February 27, 2001, Plaintiff wrote a letter to Mr. Psarianos, which served as written notification of her informal EEO complaint.  In the letter, she addressed, *inter alia*, the issuance of her first Warning Letter, "checksits," promotions, SFA feedback, timecards, and her suspension.  Plaintiff specifically stated that "[b]eing a new manager can be overwhelming at times" and that she turned to her Senior Manager, Mr. Firestone, for guidance:  "Don Firestone instructed me in many different areas with regards to my job responsibilities, apparently incorrectly at times. ... I was under the misguided impression that FedEx had a competent manager in place who knew how to effectively run the ABQA station."  Plaintiff closed by stating that she felt she "received unfair treatment" and that she was "the only manager being held accountable."  Plaintiff never mentioned that she felt that she had been discriminated against because of her gender.

On April 9, 2001, Mr. Jordan, who was serving as acting Senior Manager, issued Plaintiff a Documented Counseling for "unacceptable work practices," specifically Plaintiff's failure to ensure her goal SOP compliance. In May 2001, Ms. Baca issued Plaintiff another Documenting Counseling for again failing to meet her SOP compliance goals for the week ending April 27, 2001.  In the Counseling memo, Ms. Baca advised Plaintiff of ways to reach her SOP compliance goals and encouraged Plaintiff to reevaluate her pin-scan operating procedure.  Later in the month, on May 7, 2001, Ms. Baca issued Plaintiff a memo regarding timecard inaccuracy.

Plaintiff had issued a timecard for an employee paying him for eight hours when he had worked eleven hours and fifty minutes.  In her defense, Plaintiff stated that she "couldn't do it" and had hoped to correct the error later.[6]

Next, Ms. Baca received reports from a manager at the airport ramp that documentation on FedEx containers leaving the Albuquerque station were missing or inaccurate.  Plaintiff admitted that she was the manager in charge of securing the appropriate documentation.  These problems apparently continued and Plaintiff received an e-mail from the airport manager stating that the required documentation was still missing or inaccurate.  Finally, on June 8, 2001, Ms. Baca issued Plaintiff a Documented Counseling regarding these problems.  Again, on June 11, 2001, Ms. Baca issued Plaintiff a Documented Counseling for another timecard problem.  Plaintiff had entered an employee's timecard for five hours and forty minutes, when the employee had worked seven hours and ten minutes.  Plaintiff stated that she may have typed in the wrong employee number accidentally.

Ms. Baca issued Plaintiff a series of Documented Counselings in July.  First, Ms. Baca issued Plaintiff a Documented Counseling on July 12, 2001 for failing to meet her expectations about supplies that she had addressed in her June memo.  The next day, Ms. Baca issued Plaintiff another Documented Counseling for making another inappropriate comment about an employee in front of other employees.  The employee of whom Plaintiff spoke filed a complaint with Ms. Baca.  Plaintiff concedes that she made the statement, but states it was in jest.  Shortly thereafter,

---

[6] Mr. Jordan states that in his tenure as manager, he entered employee timecards late at least a dozen times of so and never was disciplined.  He also states that it was "common knowledge" that every now and then managers entered a timecard for an employee late.  Furthermore*, during his time at FedEx, he never heard of a manager being issued a warning letter for entering an employee's timecard late.

8

on July 16, 2001, Ms. Baca issued Plaintiff a Warning Letter for further time card inaccuracies which were brought to her attention by one of Plaintiff's employees, who had not been paid for sixteen hours and fifty-five minutes of work.  Plaintiff states that she could not find the timecard to correct it because it was on Ms. Baca's desk.

On July 16, 2001, Plaintiff was terminated pursuant to established FedEx policy for receiving three Warning Letters within a 12-month period.  Plaintiff appealed her termination under FedEx's Guaranteed Fair Treatment Procedure ("GFT").  At the first stage of the GFT review, Mr. Beckles conducted a hearing where Plaintiff was given an opportunity to present her grievances.  Mr. Beckles upheld the termination.  The next step in GFT process was a review by Mr. Psarianos.  While Mr. Psarianos originally upheld the termination, he eventually chose to reverse it after looking at Plaintiff's entire employment history at FedEx.  In spite of his reversal, Mr. Psarianos determined that Plaintiff should not be reinstated to her management position. Plaintiff was offered a part-time CSA position or a full-time courier position in Santa Fe.  Plaintiff, however, declined the offer and decided to pursue educational opportunities instead.

As to Plaintiff's EEO complaint, an internal EEO Report was prepared within FedEx in mid-2001.  Mr. Psarianos designated Managing Director Eddie Arrendondo and Human Resources Manager Deborah Reed-Garcia to investigate Plaintiff's EEO charges.  In Mr. Psarianos' final investigation report, dated May 1, 2001, he summarized Plaintiff's complaint as follows:  "Employee feels that she has been discriminated against on the basis of her sexual preference.  She also feels that she has been harassed on the basis of medical claims."  Def. Exh. D.  During the course of the investigation, Mr. Portillo, Mr. Harris, Mr. Jordan, and Dion Lopez all were asked whether they received discipline with regard to scan compliance and checkrides

(problem areas outlined in Plaintiff's first warning letter).  According to Mr. Psarianos' report, "[a]ll stated that they had not received any discipline until Melinda Baca became Sr. MGR, and that, before that they were not being held accountable for these issues.  Robert Portillo and Robert Harris have received discipline since Melinda Baca became Sr. Manager."  *Id*.  Ultimately, the report concluded that Plaintiff was:

> [T]reated unfairly with regard to discipline for scan compliance, improper use of offer letters, checkrides.  She was treated fairly with regard to improper coding of timecards, work scheduling, management training.  She was not singled out for audit of timecards.  Nor does the information support that her lifestyle was an issue with Wendell.

*Id*.  The report did not mention gender discrimination at all.

The investigation resulted in the recommendation of three corrective actions:  1) Plaintiff's October 2000 Warning Letter was to be modified to a documented counseling regarding treating employees with respect and providing training for her workgroup; 2) Mr. Beckles received a documented counseling for inconsistent treatment of employees and for failing to discuss a Warning Letter with Plaintiff; and 3) Karen Trautman received a documented counseling for inappropriate behavior towards a member of management.  Plaintiff's Warning Letter never was reduced to a Documented Counseling.  Mr. Psarianos was unable to explain why this did not occur.

In the six months after Plaintiff was terminated from her management position, FedEx did not hire any new management employees from outside FedEx.  Four males – all existing employees of FedEx – did assume management positions, however.  On August 18, 2003, Plaintiff filed a Complaint against FedEx, alleging violations of Title VII, 42 U.S.C. § 2000e, *et seq*.  Defendant now seeks summary judgment on Plaintiff's claims against it.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). There is no requirement that the moving party negate the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted). Rather than "merely show there is some metaphysical doubt as to the material facts," the nonmoving party is required to "go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

11

for that party.  *See Anderson*, 477 U.S. at 248.   Upon a motion for summary judgment, the Court

"must view the facts in the light most favorable to the nonmovant and allow the nonmovant the

benefit of all reasonable inferences to be drawn from the evidence."  *Kaus*, 985 F. Supp. at 1281.

<u>**DISCUSSION**</u>

In his Complaint, Plaintiff argues that Defendant discriminated and retaliated against her

on the basis of gender and age.  In her response to Defendant's motion for summary judgment,

however, Plaintiff addresses only her retaliation claim and her gender discrimination claim.  She

states that she will withdraw her age discrimination claim.  As such, the Court will grant

Defendant's Motion for Summary Judgment on that claim.

Defendant seeks summary judgment on all of Plaintiff's remaining claims.  First, Defendant

argues that Plaintiff is unable to make out a *prima facie* case of either gender discrimination or

retaliation.  Second, Defendant argues that even if Plaintiff is able to make out a *prima facie* case,

she is unable to demonstrate that any adverse employment actions taken against her were not

done for legitimate, non-discriminatory reasons.  Finally, Defendant argues that Plaintiff cannot

show that Defendant's explanations for the adverse employment actions were pretextual.  The

Court will address these arguments in turn.

**I.      Plaintiff's Discrimination Claim**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such

an individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Plaintiff

12

first argues that she was discriminated against by Defendant because of her gender.  Specifically, she argues that other male managers were not subject to the same degree of discipline for similar infractions.

In Title VII cases, the relevant inquiry is whether a defendant discriminated against plaintiff based on protected class characteristics.  *See E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992).  As a preliminary matter, Plaintiff argues that she has "direct evidence" that Defendant discriminated against her because of gender.  In support of this argument, she states that "Defendant's own HR Compliance Office concluded that the warning letter issued to [Plaintiff] addressed common mistakes performed by other manager(s) that received lesser discipline:  Robert Portillo and David Harris."  Direct evidence cases, however, are those in which the plaintiff attempts to prove disparate treatment by use of evidence which, "if believed, resolves a matter in issue." 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 185 (5th ed. 1999).  An obvious example of direct evidence is a statement by a supervisor that the employer "doesn't promote women."  *See E.E.O.C. v. Wendy's of Colorado Springs, Inc.*, 727 F.Supp. 1375, 1380 (D. Colo. 1989); *see also Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (direct evidence of discrimination is "smoking gun" evidence, which would take the form of "We fired you because of your age/race/gender.").  The Court finds that Plaintiff has not offered any direct evidence of discrimination.  The comments that she noted in her reply are conclusions of Defendant's Human Resources Compliance Office regarding inconsistent treatment. Gender is not mentioned specifically.  Therefore, the comments, if believed, do not automatically resolve a fact in issue in the instant case.

### A.    Gender Discrimination

Because Plaintiff does not offer direct evidence of discrimination, under the now familiar *McDonnell Douglas v. Green* burden-shifting analysis, Plaintiff must first establish a *prima facie* case of discrimination in order to survive summary judgment. 411 U.S. 792 (1973). The Court first notes that Plaintiff and Defendant do not agree on the *prima facie* standard to be applied in the instant case. Plaintiff argues that the case should be analyzed under a discriminatory termination framework: (1) she is a member of a protected class; (2) she was otherwise qualified for the position; (3) she was discharged by the defendant; and (4) she was replaced by someone not in her protected class. *See* Pltf. Resp. at 21-22. Defendant, on the other hand, argues that the case should be analyzed under a disparate discipline framework: (1) plaintiff is a member of a protected class; 2) plaintiff was disciplined by defendant; and 3) defendant imposed the discipline under circumstances giving rise to an inference of discrimination. *See* Def. Mtn. at 15.

As the Supreme Court noted in *McDonnell-Douglas* when it defined the *prima facie* elements for the typical discrimination case: "The facts necessarily will vary in Title VII cases and the specification above of the prima facie proof required...is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n.13. Furthermore, regardless of test used, the central question of the *prima facie* case is whether a plaintiff can show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576 (1978) (citation omitted).

The Court finds that it is more appropriate to analyze this case as one of discriminatory discharge. In *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000), the Tenth Circuit ruled that in cases involving termination, plaintiff can establish a *prima facie* case by

showing that: (1) she belongs to a protected class; (2) she was qualified for the job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge.[7] *See also Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999), *cert. denied*, 529 U.S. 1110 (2000).  If Plaintiff carries this burden, the defendant must then articulate a facially nondiscriminatory reason for the challenged employment action.  If the defendant makes this showing, the burden reverts to the Plaintiff to prove the proffered nondiscriminatory reason is pretextual, i.e. unworthy of belief.  *See English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1007 (10th Cir. 2001).

### 1.    Plaintiff's *Prima Facie* Discrimination Case

Plaintiff is able to establish a *prima facie* case of gender discrimination.  First, Plaintiff is a woman and, therefore, a member of a protected class.  Second, Plaintiff demonstrated that she was qualified for a FedEx management position.  As a CSA and as a manager, Plaintiff received numerous letters of commendation from her supervisors.  Although Plaintiff received many counselings and three warning letters during her tenure as a manager, none of these counselings indicated that Plaintiff was not qualified to do her job.  And if upper management thought that she was not qualified to do the job, they did not express it to her in those terms before she was terminated.  Third, Plaintiff was discharged.  Finally, Plaintiff's job was not eliminated after she was discharged, rather it was filled by a male.

---

[7] The *Kendrick* court specifically stated that the district court erred by requiring the plaintiff to satisfy the following *prima facie* case: (1) he was a member of a protected class; (2) he was discharged for violating a work rule; and (3) the defendant treated similarly-situated nonminority employees differently. 220 F.3d at 1129.  "Although the district court found that Kendrick had established a prima facie case, the district court erred in requiring Kendrick to show that Penske treated similarly-situated nonminority employees differently in order to do so." *Id.*

**2.     FedEx's Legitimate, Non-Discriminatory Reasons for the Adverse Employment Actions**

In her Response, Plaintiff concedes that Defendant's legitimate, non-discriminatory explanations for the warning letters and her ultimate termination satisfy its second-stage burden in the *McDonnell-Douglas* framework.  As such, the Court will move to the third stage of Plaintiff's *prima facie* case.

**3.     Pretext**

As FedEx has met its second stage burden, Plaintiff, then, may resist summary judgment only "by presenting evidence that defendant's reasons are pretextual, i.e., unworthy of belief, or by otherwise introducing evidence of a discriminatory motive."  *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (citing *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir. 2000)).  "A plaintiff establishes pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *E.E.O.C. v. Horizon CMS/Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000) (citation omitted).  "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."  *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999) (abrogated on other grounds).

One way a plaintiff can demonstrate pretext is by showing that similarly-situated employees were treated differently.  *See Morgan v. Hilti*, 108 F.3d 1319, 1324 (10th Cir. 1997); *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995).  An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the "'same standards

16

governing performance evaluation and discipline.'"  *Kendrick*, 220 F.3d at 1232 (quoting

*Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

Irregularities regarding disciplinary issues may also demonstrate pretext.  For example, a

plaintiff can introduce evidence that the defendant acted contrary to a written company policy

prescribing the action to be taken by the defendant under the circumstances.  *See Kendrick*, 220

F.3d at 1230.  The plaintiff can also introduce evidence that the defendant acted contrary to an

unwritten policy or contrary to company practice when making the adverse employment decision

affecting the plaintiff.  *Id*.  When determining whether a defendants actions are pretextual,

however, the Court "may not second guess the business judgment of the employer."  *Selenke v.

Medical Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001).  Furthermore, it must "look at

the facts as they appear to the person making the decision to terminate [the] plaintiff."  *Kendrick*,

220 F.3d at 1231.

       a.     *Plaintiff's Pretext Arguments*

Plaintiff attempts to show pretext by demonstrating disparate treatment, i.e. that FedEx

management treated her differently from other similarly situated male managers who violated

work rules of comparable seriousness.  Plaintiff also attempts to show pretext by pointing to

procedural and substantive irregularities associated with her First Warning Letter.  Specifically,

Plaintiff states the following:  (1) her October 23, 2000 warning letter was her first in fifteen years

of service and was "full of procedural and substantive irregularities"; (2) her February 6, 2001

warning letter was procedurally irregular because she did not receive a documented counseling

first; (3) her July 16, 2001 warning letter regarding late timecards was suspect because other

managers engaged in the same behavior and were not punished to the same level; and (4) her

17

termination was suspect because without any of the three pretextual Warning Letters, she would not have been subject to termination. FedEx argues that Plaintiff was not treated differently from anyone else and, even if she was, it was for legitimate, non-discriminatory reasons: "FedEx had, and stated at the time, ample legitimate, non-retaliatory reasons for her discipline, and nothing in the record implies that these reasons were pretextual in any way."  Def. Mtn. at 2.

To support her contention that FedEx treated males more favorably than her with respect to discipline for infractions committed by all managers, Plaintiff first points to her October 2000 Warning Letter.  When Plaintiff moved to the Albuquerque station in 1999, there were five other managers who dealt with the same supervisor and were subject to the same standards concerning performance evaluation and discipline:  Robert Portillo, Floyd Jordan, Joel Oliver, Robert Harris, and Melinda Baca. In October 2000, Mr. Beckles came to the Albuquerque Station to evaluate the performance of the managers and their employees.  According to Mr. Beckles, he had concerns about the location as a whole.  In addition, some of Plaintiff's employees had complained to him about her specifically.[8]  As a result of his visit to the station, Mr. Beckles took several disciplinary actions:  (1) he removed Mr. Firestone from his position as Senior Manager; (2) he issued Mr. Harris a Warning Letter based on Mr. Harris' conflict of interest with a FedEx vendor; and (3) he issued Plaintiff a Warning Letter.[9]

---

[8] Patricia Koppy, one of Plaintiff's employees, stated that she complained about Plaintiff's management on several occasions and discussed those matters personally with Mr. Beckles "more than once."  Def. Exh. G.  Mr. Beckles also stated that he remembered an instance when one of Plaintiff's employees called him at his office in Tulsa in the evening to express concerns.  *See* Def. Exh. B.

[9] Ms. Baca was not involved in the issuance of the October 2000 Warning Letter.  Thus, this Warning Letter and the other Warning Letters issued by Ms. Baca cannot be subject to comparison.  *See Kendrick*, 220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee insubordination.").

Plaintiff's Warning Letter listed several problem areas:  improperly coded checksits on employee timecards, failure to follow policy and procedure concerning internal promotions, improper scheduling practices, lack of training for specific duties/responsibilities, inadequate work group meetings, and demonstrating a lack of respect when dealing with employees.  Mr. Beckles suspended Plaintiff after his visit.  While he stated that "we had other things on an investigation with other managers," "at the time [Plaintiff] was the only one that was [suspended] because she was the only one that we had any specific issues with.  And they were surfaced by her employees."  *See* Def. Exh. C at 58:1-10.  According to Mr. Beckles, he did not suspend Mr. Harris right away because he had to consult with members of management outside of FedEx.  *See id.* at 58:16-19.

In her deposition, Plaintiff was unable to point to any other male manager who had substantiated problems in all, or even three, of the areas outlined in her Warning Letter.  While Plaintiff stated that she saw a lot of disrespect towards employees from Ms. Baca and Mr. Portillo and that Mr. Harris had problems with improperly coded checks on employee timecards, she presents no evidence to suggest that Mr. Beckles was aware of these problems.  These allegations are irrelevant if Mr. Beckles did not know other managers were committing the same infractions such that he could discipline them.

Further, Plaintiff's argument that she was treated differently is severely undercut by the fact that other another male manager also was disciplined harshly as a result of Mr. Beckles' investigation.  Mr. Harris received a Warning Letter for his involvement with DonRobb, a FedEx

vendor.  Later, he was suspended and eventually was asked to leave FedEx.[10]  The fact that he

was not suspended or terminated immediately as a result of the conflict of interest issue is a

business decision that this Court declines to question.  As the Tenth Circuit has so aptly stated:

> Title VII does not make unexplained differences in treatment per se
> illegal nor does it make inconsistent or irrational employment
> practices illegal.  It prohibits only intentional discrimination based
> upon an employee's protected class characteristics.  Human
> relationships are inherently complex.  Large employers must deal
> with a multitude of employment decisions, involving different
> employees, different supervisors, different time periods, and an
> incredible array of facts that will inevitably differ even among
> seemingly similar situations.

*Kendrick*, 220 F.3d at 1232 (quoting *Flasher*, 986 F.2d at 1319) (emphasis deleted).

Plaintiff also points to several procedural and substantive irregularities with the Warning

Letter.  First, Mr. Beckles gave the Warning Letter to another manager to give to Plaintiff instead

of giving it to her himself.  Apparently, Mr. Beckles did this because he was out of the area once

he had completed his Albuquerque Station investigation. Second, Mr. Beckles did not discuss the

Warning Letter with Plaintiff prior to issuing it to her and he suspended her without informing her

why he had done so.  Third, Plaintiff did not receive a Documented Counseling on these issues

before she received a Warning Letter.  Mr. Beckles and Ms. Baca, however, both testified that the

Documented Counseling stage could be passed over if the situation was serious enough.

Finally, as a result of FedEx's EEO investigation, Plaintiff's Warning Letter was to be

---

[10] On November 27, 2000, Ms. Baca issued Mr. Harris a Warning Letter for employee
favoritism.  Pltf. Exh. 17.  Mr. Harris objected to the Warning Letter because he felt that it was a
"performance issue."  *See id*.  On February 19, 2001, Ms. Baca suspended Mr. Harris with pay
pending an investigation.  *See* Pltf. Exh. 18.  He left FedEx around May 8, 2001.  *See* Pltf. Exh.
19.

reduced to a Documented Counseling.  In addition, upper management determined that Mr.

Beckles should be issued a Documented Counseling[11] for the way he handled the issuance of the

letter, as well as for inconsistent treatment of his employees.  Ms. Reed-Garcia stated that her

concerns about Mr. Beckles' "inconsistent treatment" were "not a gender issue."[12]  In fact, around

the same time that Plaintiff called Ms. Reed-Garcia to complain about Mr. Beckles, other male

managers were also calling her to complain about their treatment.  *See* Def. Exh. C at 114:24-

115:13.  Plaintiff's Warning Letter was not reduced to a Documented Counseling.  Mr. Psarianos

stated that he did not know the reason why this happened.  He speculated the following:

> I do not recall why I would not have followed this [directive to
> reduce the Warning Letter] other than if I had spoken to Wendell
> about modifying her letter and he gave me a valid reason at the time
> and information why that letter should not have been changed to a
> documented counseling.
> ...
>
> So if I was given this directive, which I obviously was, and carried
> through with the other objectives, there was a good reason why I
> did not decide to modify this warning letter to documented
> counseling.  And I can't remember the reason, no.

---

[11] Ms. Reed-Garcia had recommended that Mr. Beckles receive a Warning Letter based on
Plaintiff's appeal.  Mr. Psarianos, however, rejected this idea.

[12] The Court has considered the EEO Closure document which states that Plaintiff was
treated unfairly in certain areas and fairly in other areas with respect to the October 2000 Warning
Letter. Plaintiff argues that the document demonstrates pretext because it states that Plaintiff was
treated inconsistently compared to Mr. Portillo and Mr. Harris. The fact that the document states
that Plaintiff had been treated unfairly compared to Mr. Portillo and Mr. Harris is unsurprising,
given that all of Plaintiff's peer managers were male, except Ms. Baca.  Furthermore, the Closure
document does not state that these disparities were motivated by gender in any way.  In any case,
the Court finds that the EEO Closure document does not bear on the ultimate pretext question –
whether Mr. Beckles honestly believed that Plaintiff deserved a Warning Letter.  *See Bullington*,
186 F.3d at 1318 ("The relevant inquiry is not whether [defendant]'s proffered reasons were wise,
fair or correct, but whether [defendant] honestly believed those reasons and acted in good faith
upon those beliefs.")

Pltf. Exh. 1 at 70:4-10, 71:11-17.

As the Tenth Circuit found in *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984), *cert. denied*, 469 U.S. 855 (1984), evidence of "disturbing procedural irregularities," such as the manipulation or falsification of hiring data, can be evidence of pretext.  With regard to the first Warning Letter, the Court finds that the irregularities Plaintiff points to do not rise to the level of "disturbing."  *See Simms v. Oklahoma ex rel.*, 165 F.3d 1321, 1329 (10th Cir. 1999); *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1459 (10th Cir. 1994) (concluding minor procedural deviation in defendant's layoff procedure did not amount to evidence of pretext).

Further, even if there were minor irregularities in the issuance of the letter, the relevant issue at the pretext stage is whether Mr. Beckles honestly believed that Plaintiff's behavior (as observed by him and as was reported to him by her staff\*) warranted a Warning Letter.  "It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance."  *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).  Thus, Plaintiff's beliefs that she did not deserve the Warning Letter or that it was excessively harsh are irrelevant.

More importantly, this Court is unwilling to sit as a "super-personnel department," free to second guess the propriety of Mr. Beckles' decision to issue Plaintiff a Warning Letter for what he perceived to be serious management problems not shared by any other manager.  *See Branson*

*v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).  Ms. Reed-Garcia stated that Mr. Beckles was "adamant" that Plaintiff deserved a Warning Letter.  Plaintiff is unable to create a genuine issue of fact as to the sincerity of this belief.  *See Branson*, 853 F.2d at 772 ("[P]laintiffs' mere conjecture that their employer's explanation is pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

Plaintiff's other Warning Letters are similarly explained.  Ms. Baca issued Plaintiff a second Warning Letter for making inappropriate comments about another employee.  One of Plaintiff's employees reported to Ms. Baca that Plaintiff said:  "Well, we'll just bring her ass back here."  Plaintiff disputes ever using this language, although this contention is unsubstantiated. Separate and apart from whether she uttered those words, Plaintiff argues that she was treated disparately in comparison to Mr. Jordan, who only received a Documented Counseling for an "inappropriate conversation" between himself and one of his employees around the same time. Plaintiff argues that Mr. Jordan committed "the same conduct."   On the other hand, FedEx argues that the situations are not commensurate and that "[i]t was in Ms. Baca's discretion to treat the different situations differently, and she did."[13]  Def. Mtn. at 8.

The Court also is unwilling to second guess Ms. Baca's business judgment in this instance. First, the two situations are not identical.  Mr. Jordan's misconduct "could reasonably be viewed as less serious" than Plaintiff's conduct because it did not involve use of derogatory language

---

[13] Again, Plaintiff argues that this letter was procedurally irregular because she should have been issued a Documented Counseling beforehand.  Because the record demonstrates that this was not always the case if the matter was serious, the Court does not find that this supposed irregularity is "disturbing."

about an employee in front of other employees.  *See Rivera v. City and County of Denver*, 365

F.3d 912, 924 (10th Cir. 2004).  Ms. Baca herself determined that this conduct was not equivalent

and did not warrant equivalent punishment.[14]  "A company must be allowed to exercise its

judgment in determining how severely it will discipline an employee for different types of

conduct."  *Kendrick*, 220 F.3d at 1233.  As such, Plaintiff has not demonstrated that Ms. Baca's

decision to discipline her in this instance was pretextual.

      Ms. Baca issued Plaintiff her third Warning Letter because she entered an employee's

timecard late.  Plaintiff argues that similarly situated male managers were not punished for the

same behavior.  The timecard issue was brought to Ms. Baca's attention by one of Plaintiff's

employee, Dan Gomez, who complained that he had not been paid properly.  Plaintiff states that

she tried to enter Mr. Gomez's timecard, but was not able to do it and then could not find the

timecard.  She states that during this time, the timecard was on Ms. Baca's desk and thus she was

not able to fix it.  These facts are disputed by the parties, but irrelevant to the Court's decision

because Plaintiff is unable to show that Mr. Baca's justifications for the Warning Letter are

unworthy of belief.

      The record demonstrates that Ms. Baca previously warned Plaintiff about timecard

accuracy.  On May 7, 2001, Ms. Baca issued Plaintiff a "Timecard Entry Expectations" letter

because Plaintiff had entered an employee's timecard incorrectly and he was not properly paid.

On June 11, 2001, Ms. Baca issued Plaintiff a Documented Counseling for another timecard

problem.  Plaintiff had entered an employee's timecard for five hours and forty minutes, when the

---

[14] Had Ms. Baca determined that Mr. Jordan's behavior did not warrant any punishment,
the Court's analysis might be different.  Ms. Baca, however, simply decided to punish him less
severely.

employee had worked seven hours and ten minutes.  Plaintiff stated that she may have typed in the wrong employee number accidentally.

To support her argument that male managers were treated differently with regard to timecards, Plaintiff highlights Mr. Jordan's deposition testimony.  Mr. Jordan testified that he occasionally entered timecards late, but never was disciplined.  The Court finds that any comparison between Mr. Jordan and Plaintiff is not appropriate for several reasons.  First, Plaintiff has failed to present any evidence to suggest that Ms. Baca or Mr. Beckles knew that Mr. Jordan entered a timecard late.  Next, Plaintiff has failed to present any evidence to suggest that any of Mr. Jordan's employees received less pay or complained to a supervisor that they received less pay because he had entered their timecard late.  Without this knowledge, Ms. Baca and Mr. Beckles would not necessarily have been aware that Mr. Jordan merited any disciplinary action.  This is in direct contrast to Plaintiff, whose employee specifically complained to Ms. Baca that he had not been paid.

While highlighted favorably by Plaintiff, Mr. Jordan's additional testimony on the timecard issue is largely irrelevant to the issue of pretext.  Mr. Jordan testified that he did not know any manager who had ever received a Warning Letter for a timecard violation.[15]  He also states that it was "common knowledge" that other managers entered timecards late.  Mr. Jordan's testimony misses the issue.  Again, the pertinent question is whether Ms. Baca honestly believed that Plaintiff deserved a Warning Letter for failing to enter her employee's timecard correctly.  Based

_____

[15] In her Response Motion, Plaintiff uses this statement to assert that "no manager has ever received a warning letter for entering an employee's timecard late in his entire career with FedEx."  Pltf. Resp. at 28.  This is an obvious overstatement and it is not supported by the record.

on Plaintiff's prior counselings on this issue, it is not altogether surprising that Ms. Baca decided

that Plaintiff needed to be disciplined more severely.

Finally, on the timecard issue, Plaintiff attaches several FedEx timecard printouts

(obtained by Plaintiff while she was on suspension) to support her argument that similarly situated

male employees were treated differently.  When shown the timecards during his deposition, Mr.

Jordan testified that several of the timecards appeared to have been entered late.  When Mr.

Jordan was questioned by defense counsel about one of his timecards, however, he stated that he

could not tell from the printout "whether it was technically entered late" or whether he "had to go

in and fix something" later.  Def. Exh. B at 65:1-5.  He stated that if it was the latter, it would not

have affected his employee's pay.  *See id.*  As to the other timecards in the record, Ms. Baca

testified that the date at the bottom of the timecard similarly could be the date of the actual entry

or it could be the date when a manager made a correction to it.  Def. Exh. C at 57:18-25.  Plaintiff

agreed that it was not possible to tell whether any of the timecards were entered late:  "I don't

know that.  And you don't either.  I'm sorry, nobody does."  *See* Def. Exh. F at 81:2-3.

FedEx argues that Plaintiff's evidence here is "less than clear."  The Court agrees.

Because of Plaintiff's admission that it is impossible to tell whether any of the timecards actually

were entered late, the Court finds that they do not support an inference that she was punished for

timecard problems while other male managers were spared.  Furthermore, several of these

timecards supposedly are Ms. Baca's.  Because Ms. Baca was a senior manager at the time the

timecards were entered, any comparison between her and Plaintiff is not appropriate as they are

not similarly situated. "Similarly situated employees are those who deal with the same supervisor

and are subject to the same standards governing performance evaluation and discipline."

*Aramburu*, 112 F.3d at 1404 (citation omitted).

Ms. Baca ultimately terminated Plaintiff based on her three Warning Letters pursuant to established FedEx policy.[16]  Plaintiff appealed her termination pursuant to FedEx's GFT process. While Mr. Psarianos initially decided to uphold Plaintiff's termination, later he decided to overturn it based on "all the information" that he had gathered at the time, including her work history and her tenure with the company.  *See* Def. Exh. BB at 83:1-19.  He gave her "the benefit of the doubt for the long career" she had at FedEx.  *See id.* at 16-17.  Mr. Psarianos offered Plaintiff a part-time CSA position in Santa Fe, as well as a courier position.  She declined the offer because she would not have been able to make enough money.  Instead, she decided to pursue other educational opportunities.

Plaintiff fails to carry her burden of demonstrating that her termination was pretext for discrimination.  Plaintiff does not dispute that pursuant to FedEx policy, an employee normally is terminated on the basis of three Warning Letters or Performance Reminders in the course of one year.  Thus, the determinative issue is whether Ms. Baca honestly believed that Plaintiff should be terminated:  "a challenge of pretext requires [the court] to look at the facts as they appear to the person making the decision to terminate plaintiff."  *Kendrick*, 220 F.3d at 1231. As long as the decision to terminate was grounded on the legitimate justification, the correctness, wiseness, or fairness of the decision is irrelevant. *See Bullington*, 186 F.3d at 1318 ("The relevant inquiry is not whether [defendant]'s proffered reasons were wise, fair or correct, but whether [defendant] honestly believed those reasons and acted in good faith upon those beliefs."); *McKnight v.*

---

[16] According to Mr. Beckles, FedEx has a written policy in its Manual, 2-5 Acceptable Conduct Policy, that an employee who receives three Warning Letters within 12 months is normally terminated.  *See* Def. Exh. B.

*Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (finding plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of plaintiff and believed them to be true, even though plaintiff presented evidence to the district court that the allegations may have been false); *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment.").

Ms. Baca's reliance on Plaintiff's three Warning Letters was a legitimate justification for her termination decision and is worthy of belief.  At the time, Plaintiff's October 2000 Warning Letter had not been reduced to a Documented Counseling.  Moreover, there is no evidence that Ms. Baca knew that Plaintiff's first Warning Letter was to have been reduced to a Documented Counseling:  "I was not involved in her internal EEO appeal of the Warning Letter, nor was I questioned or interviewed about it.  I was not informed of the status of the EEO review by FedEx, nor of the result of the EEO review until after Ms. Essary's termination."  Def. Exh. I.  The evidence shows that Ms. Baca proceeded with the information she had, and after consultation with others, determined that termination was the best course of action.

Apart from her specific argument regarding the three Warning Letters and her termination, Plaintiff also argues that, on the whole, she was held to a different standard than all of the other managers after Mr. Firestone was terminated.  Even if Plaintiff had properly supported this argument in her Response, the evidence does not support it.  To the contrary, several of Plaintiff's peer male managers also began to be disciplined more severely after Mr. Beckles terminated Mr. Firestone.  As Mr. Jordan testified:

> Q.    Who was treated unfairly?

28

A.      By whom?

Q.      By anybody? ... The only people that you pointed out are Mr. Beckles and Ms. Baca who were the unfair treaters.  Is there anyone else that treated people unfairly?

A.      No.

Q.      Now, who was treated unfairly by those two?

A.      Well, in my opinion, Rosa was.  Bob Harris was.  Robert Portillo was beginning to be.  And then, like I said, I thought I was next.  If you looked at it from where I was sitting, it was going in a stage.  You know, this guy is gone.  This guy is gone.  Now this person is getting gone.  There were two of us left, and we were both flipping a coin going, "Okay, who is next?"

...

Q.      Was there anybody that Mr. Beckles wasn't trying to get rid of?

A.      Well, Melinda Baca.

Q.      Anybody else?

A.      Nope, nobody that I can think of.  There were only six of us as far as managers.  He got rid of Don Firestone.  One of the managers had stopped down just right prior to all of this happening.  He got rid of Bob Harris.  He got rid of her.  Robert Portillo felt like he was next on the list, because all of a sudden he started getting documentation for stuff that he had never gotten documentation for.  He had gotten a job right prior to getting any kind of serious documentation.  So he got a job at another station.  I thought I was next.

Pltf. Exh. 5 at 75:13-76:4, 77:1-15.

FedEx argues that after Mr. Firestone was terminated, everyone was held to a higher

standard because Mr. Firestone had failed to properly discipline his employees while he was the

senior manager.  Mr. Beckles states the following:

> There were a lot of performance issues, a lot of things that we
> measure relative to the station.  However, I felt that there were
> things going on in the location that he [Mr. Firestone] should have
> been aware of that he was not aware of.  There are things that
> should have been addressed and taken care of by him as the senior
> manager that he failed to take care of. ... Service of the location,
> the service level.  You have got the injury, the accident rates,
> employee morale issues.  I mean, there were a lot of issues.  There
> were some things that relative to the leadership of the managers
> that he should have dealt with.

Def. Exh. C at 53:13-54:1.  Mr. Jordan and Ms. Baca both testified that Mr. Firestone had a

problem disciplining other managers for their failures.  *See* Pltf. Exh. 5 at 74:12-24; Def. Exh. I.

Because of these problems, Mr. Beckles instructed Ms. Baca to try to improve the

station's overall performance from what it had been under Mr. Firestone.  *See* Def. Exh. I.

According to Ms. Baca, that directive included "holding the operations managers more

accountable than they were under Mr. Firestone for issues such as scanning, service, and

productivity."  Plaintiff argues, however, that she – and not the other four male managers –

suffered the brunt of Mr. Beckles' directive.  The Court disagrees.  Mr. Portillo received thirteen

Documented Counselings from October 16, 2000 to June 29, 2001 for many of the same issues on

which Plaintiff was counseled.  Again, the Court declines Plaintiff's invitation to second guess

management's judgment to give Mr. Portillo Documented Counselings, rather than more severe

discipline such as a warning letter.[17]  Ms. Baca also disciplined Mr. Jordan for his inappropriate

behavior towards a co-worker.  As for these transgressions by Plaintiff's peer male managers, "the

misconduct could reasonably be viewed as less serious" than the conduct of Plaintiff.  *See Rivera*,

---

[17] As the Court reasoned above, its analysis might be different if Ms. Baca had not
disciplined Mr. Portillo at all.

365 F.3d at 924.

Finally, in support of her general pretext arguments, Plaintiff frequently references her strong performance evaluations as a CSA and a manager.  The undisputed evidence demonstrates that Plaintiff was an exceptional CSA and that in the early days of her tenure as a manager, she received positive feedback from upper management.  These evaluations, however, do not create a genuine issue of fact.  Other circuits have determined that prior favorable performance evaluations do not, by themselves, establish that later unsatisfactory evaluations or disciplinary actions are pretextual.  *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3rd Cir. 1992).  "To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality."  *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3rd Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  FedEx management apparently determined that things had changed.  As Mr. Psarianos* stated, "I think in reviewing all of her [Plaintiff's] work history that she really didn't have problems until she became a manager."  Pltf. Exh. 1 at 72:2-6.  Once she was a manager, in addition to receiving the warning letters, Plaintiff also received several counselings and letters of expectation on a variety of issues.  Plaintiff does not challenge these actions as discriminatory.[18]

Thus, based on the totality of the evidence and making all inferences in Plaintiff's favor, as is required, the Court is convinced that there are no genuine issues of material fact as to whether Plaintiff was disciplined and fired for nondiscriminatory reasons.  Any procedural irregularities are

---

[18] Plaintiff does challenge the discipline she received for the freight loading problems in June 2001.  She states that Mr. Jordan also had such problems and was disciplined less severely.  Mr. Jordan, however, was disciplined in 1998 by a different manager.  Thus, the comparison is not relevant.  *See Kendrick*, 220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee insubordination.").

minor and ultimately do not bear on the question of whether Ms. Baca and Mr. Beckles – the relevant disciplinarians – honestly believed that Plaintiff deserved the discipline that she received. As such, Plaintiff has not shown that FedEx's justifications for any of the warning letters or her termination are so plagued by "weaknesses, implausibilities, incoherencies, or contradictions" as to be unworthy of credence. *See Morgan*, 108 F.3d at 1323.  FedEx is entitled to summary judgment on Plaintiff's gender discrimination claim.

## II.    Plaintiff's Retaliation Claim

According to Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

A retaliation claim also is guided by the *McDonnell Douglas* burden-shifting analytical framework. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (applying *McDonnell Douglas* to a retaliation claim).  To state a prima facie case for retaliation, Plaintiff must demonstrate that:  (1) she engaged in protected activity; (2) she suffered an adverse employment action subsequent to or contemporaneous with her protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Kendrick*, 220 F.3d at 1234.

### A.    Has Plaintiff Established a Prima Facie Case of Retaliation?

#### 1.    *Protected Activity*

32

Plaintiff alleges that she filed an informal EEO complaint in January 2001.[19]  Plaintiff did not attach that complaint to her Response.  The only evidence of Plaintiff's EEO Complaint is her February 27, 2001 letter to Mr. Psarianos which she stated was "written notification" of her informal EEO Complaint.  Defendant argues this is not protected activity because this letter did not make any specific allegations about unlawful discrimination.

The factual basis for Plaintiff's retaliation claim is the warning letters and termination that followed her internal EEO Complaint.  In her letter to Mr. Psarianos, Plaintiff stated that she was being treated unfairly as she was "the only manager being held accountable" for problems experienced by all of the managers.  Plaintiff also mentioned that she felt that she was being singled out for her "lifestyle."  In a Privileged and Confidential Inter-Office Memorandum, sent by Mr. Psarianos to Ms. Leslie Coleman, he summarized Plaintiff's complaints as follows: "Employee [Plaintiff] feels that she has been discriminated against on the basis of her sexual preference."[20]  Gender discrimination is not mentioned at all.[21]

---

[19] Ms. Baca wrote Plaintiff a letter on January 23, 2001 acknowledging Plaintiff's EEO Complaint.  The Court, however, has no evidence of what allegations Plaintiff made in her January 2001 letter.

[20] As of yet, neither the Supreme Court nor Congress has explicitly determined that sexual orientation discrimination is prohibited by Title VII.  *See Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1072-73 (9th Cir. 2002); *United Steelworkers of America v. Massachusetts*, 377 F.3d 64, 80 (1st Cir. 2004).

[21] While Ms. Coleman understood Plaintiff to be asserting that she was being treated unfairly as a result of her gender, there is no evidence that she passed that information along to Ms. Baca or Mr. Beckles.  Ms. Baca has stated that she was not involved in the grievance process at all.

In her deposition, Ms. Coleman stated that Plaintiff's "employee statement" included allegations of gender discrimination.  Plaintiff, however, did not provide the Court a copy of this statement and did not state when this employee statement was made.  Thus, the Court cannot consider it in evaluating Plaintiff's retaliation claim.

Thus, the Court finds that Plaintiff's letter does not qualify as protected activity because it makes only vague references to unequal treatment without any specific allegations of discrimination. *See Petersen v. Utah Dep't of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002) (a vague reference to discrimination and harassment without any indication that this misconduct was motivated some category protected by Title VII does not constitute protected activity and will not support a retaliation claim); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560 (2nd Cir. 2000) (to establish a prima facie case of retaliation under Title VII, an employee must have engaged in an action taken to protest or oppose statutorily prohibited discrimination); *Garcia-Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 560 (D. Kan. 1995) (protected activity must oppose Title VII discrimination, and not merely recite complaints regarding personal grievances).  Plaintiff's letter never mentions that she was being treated unfairly for her gender or that any unfair treatment in comparison to other managers was related to her gender.  Thus, even if Ms. Baca or Mr. Beckles did retaliate against her for filing an internal EEO complaint, the complaint was not protected activity under Title VII; consequently, any retaliation was not unlawful under Title VII.[22]  *See Peterson*, 301 F.3d at 1188 (if all plaintiff's supervisors knew was that plaintiff was opposing a

--------

[22] Even if the Court is wrong and Plaintiff's letter to Mr. Psarianos constitutes protected activity, Plaintiff is unable to show any causal link between that letter in late February and her third Warning Letter or termination in July 2001.  *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (suggesting that a four-month period between a plaintiff's participation in a protected activity and the alleged retaliatory action without more would be insufficient to support an inference of causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three months insufficient).

Furthermore, Plaintiff does not provide any evidence that either Ms. Baca or Mr. Beckles knew that Plaintiff's internal EEO complaint alleged any unlawful discrimination.  In fact, Ms. Baca testified that she had never heard Plaintiff say that she was being treated differently on the basis of her gender and that no one brought to her attention that Plaintiff felt she was being treated differently on that basis.  *See* Def. Exh. L at 73:14-23.

co-worker's treatment of her because "the treatment violated established practices and was unfair," they would not have known that plaintiff was opposing a practice made unlawful by Title VII).

Plaintiff alleges that she told Ms. Reed-Garcia that she was being treated unfairly on the basis of her gender before she filed her informal EEO Complaint.  Even if this could be considered protected activity, there is absolutely no evidence that any of Plaintiff's supervisors knew about these accusations such that they could retaliate against her on that basis.  *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998) (holding that a retaliatory discharge claim must be predicated on intentional and knowing retaliation, thus a plaintiff must establish that the individual or individuals who actually undertook the alleged retaliatory acts were aware or should have been aware of plaintiff's participation in the protected activity). Lastly, although Plaintiff's formal EEOC charge constitutes "protected activity," this charge was not filed until September 21, 2001 – nearly two months after Plaintiff had been terminated.  Thus, Plaintiff's Warning Letters and ultimate termination could not have been in retaliation for this charge.

As Plaintiff is unable to establish that she engaged in any protected activity before her termination, her *prima facie* case must fail as a matter of law.  FedEx is thus entitled to summary judgment on her retaliation claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** Defendant's Motion for Summary Judgment, filed July 30, 2004, **[Doc. No. 41]**, is **GRANTED**.

Dated this 1st day of June, 2005.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
Angela Cornell
K. Lee Peifer
Jane Gagne

Attorney for Defendant:
Sean Olivas
Edward J. Efkeman

36